(168 App. Div. 483)

CONTINENTAL SECURITIES CO. et al. v. BELMONT et al.

(Supreme Court, Appellate Division, Second Department. June 11, 1915.)

1. CORPORATIONS ⬅➡30—MISAPPLICATION BY DIRECTORS—STOCKHOLDERS' RIGHT OF ACTION.

A contractor for subway construction was not financially able to carry out the contract, and defendant B. organized a construction company, capitalized at $6,000,000, under an agreement whereby he and his associates were to receive one-quarter and the construction company three-quarters of the profits, and, after the subway was constructed, the shareholders of the construction company entered into an agreement providing for the organization of a new operating company and an exchange of stock of the construction company for capital stock of the operating company amounting to $9,600,000, and designated B. as banker to attend to the exchange of stock and to acquire an operating franchise, by obtaining the control of some existing corporation owning and operating a railway in the city and to acquire the stock of other companies necessary to the operating company on terms acceptable to him and to issue stock of the operating company in payment, and B. acquired 95 per cent. of the stock in the two railways operating in the city for about $270,000, and other holdings, and took a participating certificate for 15,000 shares of the proposed operating company at a par

value of $1,500,000 in return for his holdings and other services, which stock was dedicated to the purposes of the proposed operating company and was fairly worth the amount of its stock taken by defendant, and after the incorporation of a rapid transit company defendant's offer to exchange his holdings for $15,000,000 of its stock was accepted. *Held*, in an action by subsequent stockholders of the new rapid transit company to require B. and the company's directors at its original organization to account to the company for alleged misappropriation of stock issued to B., that, even if a fiduciary relation attached to B.'s purchase and re-sale of his holdings, that it was no more than a plan to share in the profits of the construction company authorized by its shareholders, to whom only B. stood in a fiduciary relation, and that, where the issue had never been disaffirmed, it had no right as against him or its directors at its organization.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 97–100; Dec. Dig. ☞30.]

2. CORPORATIONS ☞30—ACTS OF DIRECTORS—STOCKHOLDERS' SUIT.

Such action, being a derivative action, asserting rights of the corporation itself, the introduction of plaintiffs as subsequent stockholders did not clothe the rapid transit company with enlarged powers as to transactions between its organizers, so that plaintiffs had no action against the promoter or the company's directors at its organization.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 97–100; Dec. Dig. ☞30.]

3. LIMITATION OF ACTIONS ☞37—STOCKHOLDERS' ACTION—MISAPPLICATION BY DIRECTORS.

A stockholders' action on behalf of the stockholders in the corporation against its promoter and its original directors to require an accounting for stock claimed to have been misapplied by issuance to the promoter was within the ten-year statute of limitations, as the cause of action was for fraud.

[Ed. Note.—For other cases, see Limitation of Actions; Cent. Dig. § 105; Dec. Dig. ☞37.]

Appeal from Special Term, Nassau County.

Action by the Continental Securities Company and another, stockholders, etc., against August Belmont and others. From a judgment dismissing their complaint on the merits, and from an order denying their motion to set aside the granting of costs and of an extra allowance (83 Misc. Rep. 340, 144 N. Y. Supp. 801), plaintiffs appeal. Judgment and order affirmed.

Argued before CARR, STAPLETON, RICH, and PUTNAM, JJ.

J. Aspinwall Hodge, of New York City (Alexander Holtzoff, of New York City, on the brief), for appellants.

Delancey Nicoll and Joseph S. Auerbach, both of New York City (Courtland V. Anable and Charles H. Tuttle, both of New York City, on the brief), for respondents other than Interborough Rapid Transit Co.

PER CURIAM. Plaintiffs, as stockholders of the Interborough Rapid Transit Company, have brought a derivative suit, as representing that corporation. Various defendants were sued as directors of the Interborough Company at its original organization. The sufficiency of the complaint, and certain matters of procedure in the action, have been passed upon. 75 Misc. Rep. 234, 133 N. Y. Supp. 560; 150 App.

Div. 298, 134 N. Y. Supp. 635; 206 N. Y. 7, 99 N. E. 138, 51 L. R. A. (N. S.) 112, Ann. Cas. 1914A, 777.

Plaintiffs attack the validity of transactions occurring prior to and at the organization of the Interborough Company, on an occasion when 1,500 shares of its capital stock were issued to August Belmont & Co., whom, with other defendants then in the board of directors, plaintiffs ask to account to the corporation for such misapplied stock. The complaint charges such issue as part of an illegal scheme and conspiracy to enable the defendant incorporators and directors and the firm of August Belmont & Co. "to receive an extortionate and illegal bonus and profit out of the treasury of the defendant corporation."

The evidence at the trial recounts the difficulties and delays in obtaining a responsible bidder to undertake to carry through the extensive designs of the Rapid Transit Commission for a municipal subway. During the five years from 1894 to 1899, the plan remained unrealized, as the commission had failed to interest engineering capital. After Mr. McDonald presented his bid, he had to obtain financial support to meet the great outlays of construction, also to furnish the security imposed as a condition before his bid would be accepted.

Defendant Belmont was able to procure the means, and to interest others to assist to finance this enterprise. On February 21, 1900, the Rapid Transit Commission entered into a contract with Mr. McDonald for the building and operation of the subway. A construction company with $6,000,000 capital was first formed. Mr. McDonald and his associates were to have one-fourth of the profits, and three-fourths were to go to this construction company, which basis of division was extended to the profits from the future subway operation. In the construction company were many banking firms and representative men of financial standing.

In the latter part of 1900, the excavation for the subway had been so well started that it was considered seasonable to form the operating company, which should equip the finished subway and operate its trains. The Rapid Transit Act, however, did not authorize the formation of such a corporation. Counsel agreed that such operation must be undertaken by a railroad corporation having or operating a railway in whole or in part within New York City. The Legislature was applied to for an act to amend the Railroad Law so as to permit forming such a corporation. But such a remedial statute was not passed. It then became necessary to acquire without delay an existing railroad corporation, qualified to meet this situation, so that it might be the lessee of the new subway system. On account of the opposition of other surface systems, this would necessarily have to be arranged with secrecy and dispatch. Two companies operating railroads in New York City—the City Island Railroad Company and the Pelham Park Railroad Company—were deemed available, and apparently were the only lines which Belmont & Co. could obtain for this purpose. Accordingly, Belmont & Co. proceeded to gather up the stock and bonds outstanding of these companies. For an outlay of about $270,000 they gradually purchased over 95 per cent. of the stock of the two companies and control of the outstanding bonds.

On December 16, 1901, a subscribers' agreement was entered into by the shareholders of the construction company, which recited the prior agreements for the building of the subway under the McDonald bid and contract, and provided for organizing a new corporation for the equipment and operation of the subway, with exchange of stock in the existing construction company for the capital stock of the contemplated operating company, which was to have a capital of $25,000,-000, of which $9,600,000 was to be applied to take and acquire the existing construction company with the interests of Mr. McDonald. In this way, the $6,000,000 investment in the operating company was raised to $9,600,000 in the projected capitalization, so that each $100 share of the first corporation would receive $160 stock in the new organization.

August Belmont & Co. were designated as "the bankers" who should attend to the deposit and exchange of stock, or the voting certificates therefor. The bankers were also given authority to fix and adjust the terms upon which the operating company should acquire the interest of Mr. McDonald, and the interests of other persons than the construction company, the prices for such outside interests not to exceed in all $2,500,000. In contemplation of having to obtain an existing railroad, the bankers were further authorized:

"To acquire stock of any corporation which may be necessary or useful in connection with the formation of the operating company, on such terms as the bankers may approve, and to make or to cause to be made payments therefor in the shares of the operating company or in the proceeds of the sale of such shares; and the bankers are specially authorized and empowered themselves to purchase any stock of such corporation or corporations, and after such purchase, without accountability in respect thereof, to sell the same to the operating company for such price as they may deem reasonable and proper."

After this agreement, Belmont & Co. acquired some other lots of stock in the City Island and Pelham Park Railway Companies. About January 8, 1902, Belmont & Co., acting under this subscribers' agreement, turned over for this organization, not yet incorporated, their holdings of these railroad stocks and securities, which they had so acquired, and took a participation receipt for 15,000 shares, of the par value of $1,500,000, in the proposed operating company when it should be organized. In their stock register, by entry then made, it was stated that this stock was to be issued for the purchase of stock of the City Island and Pelham Park Companies, and for other considerations and services.

The trial court has found as a fact that such stock and bonds were dedicated for the purposes of this enterprise; that the certificate was issued in the honest and reasonable belief by Belmont & Co. that for said purposes such stocks and securities were fairly and reasonably worth the amount of stock in the operating company, to be deliverable to Belmont & Co. when it should be issued; also that for this object the stock and securities, with the services of Belmont & Co., had a value to the enterprise equal to, or in excess of, the par value of the participation certificate for the 15,000 shares of the new company; that Belmont & Co. were not to be otherwise compensated for said

services contemplated by the subscribers' and associates' agreements of December, 1901.

Having obtained these corporations, under whose charters the proposed operating company might act, Belmont & Co. in the end found it needless to resort to the City Island and Pelham Park Railroad Company charters, since on April 11, 1902, the Legislature finally passed an act permitting the proposed incorporation under the General Railroad Law (Laws 1891, c. 4)—Laws of 1902, c. 544—so that in May, 1902, the Interborough Rapid Transit Company was thus organized to operate the new subway system. After it had been so organized, and the directors had been named, followed by certain exchanges of participation certificates, Messrs. Belmont & Co., on May 14th, wrote to the Interborough Company, offering to exchange these holdings of the City Island and Pelham Park Companies for $1,500,000 stock in the Interborough Company—

"said last-mentioned sum also to cover all compensation to us for our services in procuring the assignment of the contract and interests as above stated, and the sale and transfer of the stock of Rapid Transit Subway Construction Company, and the said subscription."

This offer was accepted at a meeting of the board of directors, in which Belmont & Co. did not participate, and the certificate so delivered to Belmont & Co., which transaction of May 14, 1902, the Interborough Company has never disaffirmed.

[1] The Continental Securities Company, a plaintiff here, did not become a stockholder in the Interborough Company, or a holder of voting trust certificates therein, until January, 1906, when it acquired voting trust certificates for 300 shares, which, in May, 1907, were exchanged for Interborough Company stock. The individual plaintiff, Mr. Venner, did not become a stockholder of the Interborough Company until April 28, 1910, when he received 50 shares out of the 300 shares of the Continental Securities Company aforesaid. The present suit was begun May 4, 1910. A full investigation of all the facts and circumstances in the trial at Special Term has resulted in findings by the trial court which negative fraud or bad faith and the charges of exaction of an extortionate bonus by Belmont & Co. With these findings we agree. There, however, remains a question as to the relation of Mr. Belmont and his partner in taking up and financing this enterprise.

Plaintiffs urge that, as promoters, Belmont & Co. (and Mr. Belmont, as the salaried president of the first corporation) held such fiduciary relations to the future corporation that they could not make any profits on the resale of these railroad stocks to the new operating company, nor, by means of such gains, be recompensed for their services. Munson v. Syracuse, etc., R. R. Co., 103 N. Y. 58, 8 N. E. 355; Old Dominion Copper Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314. It may be observed that the gravamen of the complaint herein was fraud and misappropriation, and it was on the basis of these allegations, taken as true upon the demurrer, that the complaint has been sustained. 206 N. Y. 7, 19, 19 N. E. 138, 51 L. R. A. (N. S.) 112, Ann. Cas. 1914A, 777.

Granted, however, that a fiduciary relation attached to this purchase and resale of these railroad stocks and securities, between whom was such relation and confidence? Plainly as to the associate subscribers who empowered Belmont & Co. to buy on the bankers' own terms, and through the participating certificate to receive the increase or advance which, if too high, tended to reduce the profits of the other organizers. All of these allotments of future stock in the new operating company were in part on the basis of profits. As between these organizers no wrong was done if they could issue and distribute as much stock as they liked in return for their respective interests in the construction contract then nearing completion. The subscribers associated in control of the construction company, and those interested with Mr. McDonald's original contract, could contract with one another, dealing together, as buyers, sellers, and organizers, since in this initial stage of these transactions, no others were legally interested. Blum v. Whitney, 185 N. Y. 232, 77 N. E. 1159; Old Dominion Copper Co. v. Lewisohn, 210 U. S. 206, 212, 28 Sup. Ct. 634, 52 L. Ed. 1025. It cannot, therefore, be rightly held that the issue of the participating certificate for 15,000 shares was a misapplication of the assets of the future corporation, any more than might be the amount which the associates fixed as a compensation for Mr. McDonald's interest in this enterprise. Several corporate and individual interests were being merged and consolidated, and such a division of capitalized profits (while subject to scrutiny and avoidance by those having financial concern in the allotment) is not a wrong to the corporation, considered as to its later stockholders. A scheme to share in the profits of construction, with all the members of the corporation assenting, is no fraud on the corporation. Barr v. N. Y., L. E. & W. R. R. Co., 125 N. Y. 263, 273, 26 N. E. 145.

[2] The present suit is a derivative one, asserting rights of the corporation itself. These plaintiffs came into it four or five years after these transactions. The introduction of later stockholders, whether few or many, did not clothe the Interborough Company with enlarged powers as to transactions between its organizers. Old Dominion Copper Co. v. Lewisohn, supra; Hutchinson v. Simpson, 92 App. Div. 382, 87 N. Y. Supp. 369.

We are cited the judgment of the Massachusetts Supreme Court, which by a bare majority held adverse to the law of the federal Supreme Court. Old Dominion Copper Co. v. Bigelow, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314. As was there pointed out in the dissent by the Chief Justice, the federal court cited decisions of New York; and in this class of cases the law ought to be the same in the state courts as in the federal courts. 203 Mass. page 230, 89 N. E. 193, 40 L. R. A. (N. S.) 314. We are convinced that in the questions here raised of fiduciary relations, or breach of confidence, no good ground is shown to extend the right of the corporation to avoid such transactions by reason of later stockholders coming in with the attitude of these plaintiffs.

As remarked by the learned justice at Special Term, since July 1, 1907, Public Service Commissions in this state have been vested with

supervisory power over such corporations, in order to guard investors and the public against the tendency of such corporations to become overcapitalized.

[3] In our consideration of this appeal, we have assumed that the ten-year statute of limitations (section 388, Code Civ. Proc.) applies. It may be added that the late Justice Burr, who heard the case, but did not live to take part in this decision, recorded his views as in favor of an affirmance.

The dismissal upon the merits, and the order denying plaintiffs' motion to set aside the granting of costs and allowances to defendants, should be affirmed, with costs.