*521
 
 Van Voorhis, J.
 

 Both of these actions arise out of the promotion of co-operative apartment houses,
 
 “
 
 Northridge ” on Northern Boulevard, Jackson Heights, Queens, and “ Knolls ” at Biverdale in The Bronx. Although the complaints are not identical, in each instance the action is brought by the co-operative corporation after its control had been acquired by tenant-owners, against officers and directors who were in office when the lands were acquired and the buildings constructed. The misconduct charged against the defendants in each action is essentially similar, such as erecting the co-operative apartment house upon land leased at excessive ground rental from another corporation owned and controlled by themselves, letting building contracts at excessive cost to corporations likewise owned and controlled by themselves, altering the plans and specifications while the work was in progress so as to cheapen the apartments which the tenants had contracted to acquire, and other breaches of trust. Both appeals are from nonfinal orders entered upon motions addressed to the complaints. In
 
 Knolls
 
 (the later action) the motion was to dismiss several of the causes of action by summary judgment. In
 
 Northridge
 
 the notice of motion asks for dismissal of the complaint for insufficiency and lack of legal capacity to sue, and for other complicated relief. Although the notice of motion in
 
 Northridge
 
 occupies six pages of the printed record, all that is raised on its appeal is the striking of some of the allegations as sham. Special Term’s order was modified by the Appellate Division. The only question certified by the Appellate Division in that case relates to paragraphs of the complaint that were stricken without leave to replead. The form of that question which we are to answer is as follows: “ Was the order of the Appellate Division striking out specified paragraphs of the complaint
 
 *522
 
 without leave to replead, properly made?” That refers us exclusively to the portion of the Appellate Division’s order which reads: “ Ordered that said motion of defendants be and the same hereby is granted to the extent that Paragraphs 15 (other than subdivision (i) thereof), 17A, 17B, 18A, 18B, 20A, 20B, 23B and 25 of the complaint be and the same are hereby stricken without leave to replead These paragraphs will soon be discussed in more detail.
 

 The Special Term order denying defendants’ motion in
 
 Knolls
 
 for summary judgment was unanimously affirmed by the Appellate Division, and the following question was certified: Was the order of Special Term correct in denying defendants’ motion for summary judgment dismissing the fourth, fifth, sixth, seventh and eighth causes of action, and paragraphs 75 to 81, inclusive, of the ninth cause of action, pleaded in the complaint herein?” Where the Appellate Division has granted leave and certified a question for review, it has been customary to entertain jurisdiction unless it appears that summary judgment was denied in an exercise of discretion (Cohen and Karger, Powers of the New York Court of Appeals, pp. 385-386;
 
 Muscelli
 
 v.
 
 Starr Contr. Co.,
 
 296 N. Y. 330;
 
 Costello
 
 v.
 
 Simmons,
 
 295 N. Y. 801;
 
 Shapiro
 
 v.
 
 Equitable Life Assur. Soc.,
 
 294 N. Y. 743). The main question which defendants seek to have us review in
 
 Knolls
 
 concerns whether section 213 of the National Housing Act (U. S. Code, tit. 12, § 1715e, as amd.) precludes the prosecution of an action of this nature in the State courts; i.e., whether the doctrine of
 
 Fieger
 
 v.
 
 Glen Oaks Vil.
 
 (309 N. Y. 527) requires the dismissal of the
 
 Knolls
 
 complaint upon the law. That question is also present in the
 
 Northriclge
 
 case. A number of other questions are common to both actions. The logical as well as the chronological sequence calls for discussion of the
 
 Northridge
 
 appeal first.
 

 THE NORTHRIDGE COOPERATIVE
 

 The
 
 Northridge
 
 motion, it will be recalled, is limited for the purposes of this appeal to paragraphs of the complaint that have been stricken as sham without permission to replead. We are' therefore not concerned with stricken paragraphs where the plaintiff has been allowed to replead, nor with whether the complaint states a cause of action after any of the paragraphs have been stricken. Buie 103 of the Buies of Civil Practice
 
 *523
 
 states that
 
 “
 
 Affidavits may be used to determine whether matter contained in a pleading is sham.” Most of the facts relevant to this motion are contained in the
 
 Northridge
 
 complaint; such added facts supplied by affidavit have been considered as are uncontradicted or incontrovertible. This motion was denied at Special Term in its entirety, apparently upon the theory that
 
 Northridge
 
 differs from the ordinary business corporation in that it is a co-operative corporation not organized for profit. Section 213 of the National Housing Act, and the New York Cooperative Corporations Law, under which plaintiff was organized, are said to require this interpretation. We believe that the better view is thus -stated in the majority opinion at the Appellate Division, per Callahan, J.:
 

 “ A perusal of section 213 of the National Housing Act and the regulations issued thereunder discloses that the law, while it relates principally to the insurance of mortgages by the Federal agency, contemplates a method for the promotion of the construction of co-operative housing units by private sponsors. * * *
 

 ‘ ‘ That the element of private sponsorship on a basis of profit to the promoters was contemplated as to the co-operative as well as the privately owned housing projects seems evident from a reading of the statutes and the regulations issued thereunder. Action by the sponsor in his own behalf, and at his own expense, up to a certain point was required. This involved acquisition of land, preparation of plans and specifications, arrangements with mortgagees for loans, and submission of the project to the Federal Housing Administration for insurance on the loan. It is apparent that until the tenants of a co-operative project came into the picture, the sponsor was acting on his own behalf and at his own risk. As the co-operative corporation was to be incorporated by the sponsor, the original directors of that corporation would have to be nominated by the sponsor. *
 
 * *
 
 The proposal would not get into the nonprofit stage until the tenants came into control. It would be a legitimate profit-making venture for the promoter up to the point where the land was bought or leased, the building to be erected was planned and contracted for, and the mortgage commitment approved. If promoters were to make profits, and,
 
 *524
 
 concededly, they were entitled to do so, they would have to be made in connection with the sale or lease of the land and the arrangement of the price for construction of the buildings.”
 
 [1]
 
 We pass to the theory of the action.
 

 The complaint alleges that defendants Winston and Muss organized the plaintiff corporation
 
 (Northriclge)
 
 and held all of its issued stock (in their own names or in the names of nominees), in addition to the stock of several other corporations briefly described as “ Greenway ”, “ 32nd Avenue ”, and “92nd Street ”. The complaint further alleges that, during and prior to December, 1950, defendants Winston and Muss conspired to exploit for their own benefit section 213 of the National Housing Act and the implementing Federal Housing Administration (FHA) regulations by causing Greenway to acquire the necessary land and lease it to plaintiff at an exorbitant ground rental, which is alleged to have been done with the consequence that plaintiff is burdened with a ground rental bearing no reasonable relation to tlie true rental value or to the cost to the owners. The complaint further alleges that these defendants conspired to cause plaintiff to enter into a construction contract to erect
 
 *525
 
 the apartment building at an exorbitant price. The original contract for construction is alleged to have been between plaintiff and 32nd Avenue, and later to have been amended by agreement between these same parties January 12, 1951. The latter date is important, inasmuch as stock subscriptions were made by tenant-owners of this co-operative on and after December 23, 1950. By January 12, 1951 defendants had ceased to bo the only persons financially interested in the project. The complaint continues by alleging that after January 12, 1951 the amended contract of construction was assigned to individual defendants, and by them on April 7, 1951 to 92nd Street, which entered into a new construction agreement with plaintiff in August, 1951. Our consideration of this appeal is simplified by noting that the paragraphs of the complaint alleging the amendment to the construction contract on January 12, 1951, and its subsequent assignments and revision have not been finally stricken by the order of the Appellate Division. "We are only concerned with the ground lease and the original construction contract between plaintiff and 32nd Avenue, which were made before any of the co-operative owners subscribed for their stock. The other charges made by plaintiffs, such as that the plans and specifications were altered after contracts had been let so as to cheapen the structure for the private benefit of Winston and Muss, and that they misappropriated bond premiums and neglected to construct the building in accordance with the plans and specifications, pertain to allegations that remain in the complaint or which have been allowed to be repleaded. Consequently they are not at issue on this appeal.
 

 The basis on which these allegations concerning the ground lease and original construction contract were stricken as irrelevant and sham, is succinctly expressed in the majority opinion by the Appellate Division. Here the time schedule of events becomes important. An affidavit submitted to Special Term by Irving Margolies, one of the attorneys for plaintiff, gives the dates on which the ten earliest subscriptions by tenant-owners were entered. These dates range from December 23, 1950 to February 3, 1951. The ground lease with G-reenway and the construction contract with 32nd Avenue were both signed December 8, 1950 as alleged in the complaint. The FHA certificate of eligibility providing for approval of the project under section 213 of the National Housing Act had been issued a few
 
 *526
 
 days earlier. The moving affidavit of defendant Norman K. Winston sets forth without contradiction that none of the persons who were stockholders of plaintiff when this action was instituted were stockholders on December 8, 1950. The complaint alleges, in effect, that defendants Winston and Muss and their nominees were then the sole stockholders. The rebuttal affidavit of Margolies concedes that none of the tenant-stockholders were stockholders on December 8, 1950. The Appellate Division assumed that the tenants became the owners of plaintiff’s stock when they signed their subscription agreements, though, in fact, their stock was not issued until later.
 

 The following excerpts from the Appellate Division’s opinion summarize the theory on which its decision was made:
 

 “
 
 We fail to see how they [defendants] would be under any fiduciary obligation to the future tenants in these initial stages.
 

 *¿¡, ¿t.
 
 w if
 

 w if
 

 “ The fact that a promoter was interested in the landlord company as well as in the plaintiff, when the ground lease was made, or in the building construction company, when the contract for the erection of the building was entered into, would add nothing to any cause of action based on breach of fiduciary duties. Self-dealing at this stage was proper. In fact, the promoter alone was interested, until the loan was approved and the tenants purchased their apartments.
 

 w ip
 

 “ Up to the time when the tenants subscribed for their apartments, the situation was legally the same as in the initial stages of corporate promotion work. To a point in such transactions no one is legally interested, except the organizers
 
 (Old Dominion Copper Co.
 
 v.
 
 Lewisohn,
 
 210 U. S. 206;
 
 Blum
 
 v.
 
 Whitney,
 
 185 N. Y. 232;
 
 Continental Securities Co.
 
 v.
 
 Belmont,
 
 168 App. Div. 483, affd. 222 N. Y. 673;
 
 Hutchinson
 
 v.
 
 Simpson,
 
 92 App. Div. 382).
 

 ££ It would not be equitable to permit plaintiff, after it came into the control of the tenants, to attempt to reduce the ground rent or show the excessive cost of the building on the theory that the directors of plaintiff at the times these costs were agreed upon owed fiduciary duties to tenants, whose rights had not come into existence, to secure lower prices
 
 (Capitol Wine & Spirit Corp.
 
 v.
 
 Pokrass,
 
 277 App. Div. 184, affd. 302 N. Y. 734).”
 

 
 *527
 
 What has been said is subject to the qualification that where additional stock is contemplated to be issued by a corporation to uninformed outsiders, or the public is to be invited to become original subscribers for the stock in a corporation, and this intention or plan is carried out, the promoters must account to the corporation for profits of this nature of which the future subscribers had no notice or to which they did not assent, notwithstanding that at the time of the transaction in question all of the stock which had been issued or subscribed was held by the promoters or others who knew of their profits and assented to them (85 A.L.E. 1276;
 
 Erlanger
 
 v.
 
 New Sombrero Phosphate Co.,
 
 3 App. Cas. 1218; see the dissenting opinion by Justice Hatch in
 
 Hutchinson
 
 v.
 
 Simpson,
 
 92 App. Div. 382, 407
 
 et seq.;
 
 1 Fletcher’s Cyclopedia Corporations, § 192, p. 614; § 196, p. 643).
 

 The Appellate Division recognized that rule, but found it to have been complied with, stating: “ They did owe the duty of full disclosure of the terms of the deal to those to whom apartments Avere sold. But there can be no doubt in this case that the tenants were told of the existence of the ground lease and the building contract. Whether they actually examined the documents or considered the prices fixed Avould be immaterial, if they had notice.”
 

 The moving affidavits Avhich were before the court under rule 103 on this motion to strike paragraphs from the complaint as sham, set forth the form of subscription agreement signed by the tenant-stockholders, which contained the following language : ‘ ‘ There has been exhibited to me and I have read the copies of the Agreement for the construction of the project and the agreement for the lease of the ground and other pertinent agreements. I hereby consent to, confirm and agree to the execution by the company of these agreements ”.
 

 It is undisputed that these tenant-stockholders did sign subscriptions containing this clause. The rebuttal affidavits do not deny nor, in the nature of things, could they deny that these subscribers Avere informed of the existence of these agreements. The rebuttal affidavits merely contradict the statement in the written subscription agreement that copies were exhibited to the subscribers. At the very least, it is undisputed that the subscribers were put upon notice that a ground lease and construction contract had been made before their subscriptions
 
 *528
 
 were received, and that in signing the subscription contract they confirmed these agreements. Being literate persons, without any deception being claimed concerning the nature or substance of the subscription agreements which they signed, the subscribers are presumed to have read them and to have been aware of their contents
 
 (Pimpinello
 
 v.
 
 Swift & Co.,
 
 253 N. Y. 159).
 

 The most that defendants obtained under the Appellate Division’s order, insofar as it is before us under the question certified, was to have stricken from the complaint paragraphs relating to the ground lease- and original construction contract with 32nd Avenue made December 8,1950. Change orders varying the plans and specifications during construction so as to cheapen the building, breach of contract in failing to erect the structure in accordance with plans and specifications in force, misappropriation of mortgage premiums and other transactions alleged to have occurred subsequent to the entry of subscriptions of the stockholders, either remain in the complaint or may be repleaded under the order of the Appellate Division. In neither instance are they before us for consideration upon this appeal.
 

 THE KNOLLS COOPERATIVE
 

 On the
 
 Knolls
 
 appeal, the motion at Special Term is to dismiss for insufficiency certain causes of action charging similar breaches of trust by the promoters of this enterprise. The corporate lessor of the land and the construction corporation, as in the
 
 Northridge
 
 appeal, are alleged to have been owned and controlled by the individual defendants while they also controlled the plaintiff co-operative corporation. In
 
 Knolls,
 
 unlike
 
 Northridge,
 
 the alleged misconduct of the defendants occurred entirely after the tenant-stockholders had subscribed for their shares. Whatever losses ensued thus fell upon the tenant-stockholders after they had made their commitments to purchase into the co-operative. Special Term denied the defendant’s motion and the. Appellate Division unanimously affirmed.
 

 Citing
 
 Fieger
 
 v.
 
 Glen Oaks Vil.
 
 (309 N. Y. 527), defendants-appellants contend that FHA approval of the loan on this cooperative apartment house gave plenary absolution to whatever breaches of fiduciary obligation may have been committed by defendants in the leásing of the land and the construction of
 
 *529
 
 the building. That is to say, they contend that reference to the National Housing Act in plaintiff’s certificate of incorporation and in the subscription agreements signed by the tenant-stockholders implies that the ground rental, construction cost and other factors were to be approved by the Federal Housing Administrator, and that the authority conferred upon that officer by sections 207 and 213 of the National Housing Act and the implementing regulations superseded the equitable jurisdiction of the New York Supreme Court to enforce the fiduciary obligation of these directors. Signing the subscription agreements by the tenant-stockholders could not, of course, ratify future acts of the directors. Only past transactions are subject to ratification
 
 (Matter of Corrigan
 
 v.
 
 Joseph,
 
 304 N. Y. 172). The basic issue posed by defendants-appellants is whether the powers conferred upon the administrator by Federal statute have divested the State court of its equitable jurisdiction under these circumstances.
 

 The distinction between these cases and
 
 Fieger
 
 v.
 
 Glen Oaks Vil. (supra)
 
 is that in
 
 Fieger
 
 no question arose of breach of fiduciary duty. There was no cause of action recognized by any existing principle of law whereby Fieger could recover except that the rent which he had agreed to pay might have been less if the administrator had imposed a lower rent ceiling. No co-operative corporation was involved. No contention was presented that corporate directors or promoters had enriched themselves by violating their obligations as trustees for stockholders. It did not appear that the tenants had been defrauded or overreached in any manner which State law recognized, with the consequence that the tenants were without remedy unless they might discover one in the newly enacted National Housing Act which nullified, as they contended, the consent of a tenant to pay more than the administrator approved. The rent reserved in the leases in
 
 Fieger
 
 was in accord with the amounts approved by FHA, and the only relief which could have been available on any theory would have been by retroactive downward revision of the administrator’s ruling in approving the rent schedule. We held in
 
 Fieger
 
 that such relief could not be obtained in the State courts, whether or not it was available in the Federal courts.
 

 In determining whether the National Housing Act divests stockholder-tenants in co-operatives of legal or equitable rights
 
 *530
 
 against corporate directors which they would otherwise have, it is necessary for us to consider the scope of the Federal administrator’s function in order to ascertain whether it conflicts with the jurisdiction of the State courts which is being invoked. We conclude that it does not conflict with the exercise of such jurisdiction, and that the New York Supreme Court retains power to adjudicate the issues tendered by these causes of action in the complaint. There is no Federal administrative forum in which these equitable contentions could be adjudicated. A decision in favor of plaintiff in the interest of these stockholder-tenants in this action would not impair the security of the FHA mortgage, nor would it alter FHA rulings that have been made. Recovery in this action by the co-operative corporation against its original sponsors would, on the contrary, improve the mortgage collateral by improving the financial status of the mortgagor corporation without changing the FHA arrangements. It would not reduce the rents which the tenant-stockholders are obligated to pay under their leases, except, perhaps, by some distribution or credit to the tenant-owners as stockholders of the co-operative. This would not decrease the amount of any payments upon the mortgage loan or of any carrying charges of the co-operative, nor impair the liability of the tenant-owners under their leases to contribute whatever is necessary to meet these obligations. It would only mean that the private sponsors of the enterprise would be required to assist the tenant-stockholders in defraying these obligations by refunding to the plaintiff corporation some of its assets which they are charged with having misappropriated.
 

 The only action taken by FHA which could possibly conflict with a recovery by plaintiff in this action is the administrator’s approval of these apartment leases. The leases do not provide for payment of specific sums of money. They conform to the usual pattern of leases in co-operative apartment houses requiring the tenant-owners to contribute ratably the amount needed from year to year to defray the carrying charges, including mortgage amortization. In approving these leases, the administrator had before him the data submitted by these defendants-appellants concerning the cost of the building and the amount of the ground rent, but he took no formal action in respect of them. These statistics were merely part of the evidence before him when he approved the loan and the tenants’
 
 *531
 
 leases. These leases would not be altered if plaintiff recovers in this action against the sponsors of this enterprise; the mortgage would not be reduced, and would remain payable at the same interest rate and according to the same schedule of installments; the tenants would continue to be responsible for the same obligations. The only difference would be that defendants would be required to account for alleged misappropriation or waste of plaintiff’s corporate assets, which would assist the stockholders in meeting these corporate obligations in proportion to whatever extent defendants are accountable as fiduciaries.
 

 It is significant that the National Housing Act itself makes use of corporations organized under the laws of the States to carry out its purposes. The very section 207 (subd. [b], par. [2]; U. S. Code, tit. 12, § 1713, subd. [b], par. [2]) which provides that projects are to be “ regulated or restricted ” by the administrator “as to rents ” in such manner as to provide “ reasonable rentals to tenants and a reasonable return on the investment ”, states that in order to accomplish this object he may acquire “ for not to exceed $100 such stock or interest in, any such corporation, association, cooperative society, or trust as he may deem necessary to render effective such restriction or regulation.” The amended charter of plaintiff accordingly states that plaintiff may not permit * ‘ the occupancy of any of the dwelling accommodations of the Corporation
 
 except at or below
 
 the charges fixed by the schedule of charges provided for hereinafter ”. Later on it provides that “no charge shall be made by the Corporation for its accommodations
 
 in excess of
 
 a schedule to be filed with and approved in writing by the
 
 holders of the preferred stock
 
 ” (italics supplied). The preferred stock is entirely held by FHA. The charter stated that the schedule shall not be changed and that plaintiff shall not permit any occupancy except in accordance with the schedule of charges so approved by the holder of the preferred stock FHA was intended by the Congress to be the sole preferred shareholder, and to carry out its purposes through the medium of corporations such as plaintiff. The Congressional intent could not have been clearer that the administrator’s authority is to be exercised by means of a State corporation amenable to State law. The equitable jurisdiction of the State courts to enforce fiduciary obligations of directors and promoters is
 
 *532
 
 interwoven into State corporation law and was not intended to be pre-empted by the National Housing Act. If plaintiff were suing to compel the administrator to act in a particular manner, the suit could not be maintained in a State court
 
 (Fieger
 
 v.
 
 Glen Oaks Vil., supra).
 
 But that is not this lawsuit, which is not being maintained in derogation of any official act which the Federal Housing Administrator has performed that is binding on these parties.
 

 The administrator has been charged under the National Housing Act with two different functions: to protect the United States Treasury by approving only financially sound mortgage risks, and to prevent veterans or other tenants from being victimized by exorbitant rents while FHA loans are outstanding on the property. Possibly the language of plaintiff’s charter which has been italicized would nullify automatically a covenant in a lease to pay more rent than the administrator prescribes (cf.
 
 Brinkmann
 
 v.
 
 Oben Realty Co.,
 
 10 N. J. 113), but such a limitation, as plaintiff’s charter indicates, is for the benefit of tenants, and it is obvious that a tenant could not be compelled to pay more than his lease provides if it were less than the amount scheduled by the administrator.
 
 [2]
 
 The corporation is placed under contractual obligation with FHA, to be sure, to charge as much as the rent schedule provides, and very possibly if the corporation made leases with tenants at lower rentals this would constitute a breach of condition or default which would accelerate payment of the mortgage before its maturity date. That would pertain to the administrator’s responsibility as a fiscal agent of the United States, but it would have nothing
 
 *533
 
 to do with his function as guardian of tenants. It is no duty of his to exercise benevolent supervision over real estate developers. The law contemplates that they will serve their own interests without the need of supervision by the Government. In his relation to them, the administrator acts as negotiator and agent of the Government, not as judge or quasi-judge. His decision that a loan should be rejected for FHA mortgage insurance is not a quasi-judicial determination. It is binding upon no one and is made without responsibility to anyone except under the responsibility which the administrator bears as fiscal agent to the United States Government. Similarly a decision by the administrator that a loan is eligible for insurance if the mortgagor requires the tenants to pay sufficient rent to carry the project, does not constitute
 
 res judicata
 
 nor pre-empt the jurisdiction of the State courts. It is not in itself binding upon the tenants, although it may foreshadow the leases by which they afterward commit themselves. But it is the leases and not the administrator’s ruling which are self-executing against the tenants. Even if the administrator might have withheld his approval of these tenants’ leases if these defendants-appellants had brought to his attention in their ex parte application what the complaint alleges to be the true facts of this situation, his approval does not bar the enforcement of rights which they possessed without his intervention nor render them liable for more rent than that for which they have contracted. Whatever added protection the administrator might have given to these tenant-stockholders if he had approved a lower rent schedule does not deprive them of their independent rights. The administrator’s responsibility is to the tenants and to the United States. The Federal statute did not intend him to be a bárrier against access by the tenant-stockholders to the courts, nor to supply immunity to promoter-directors from the consequences of misappropriation or breach of trust in the conduct of corporate affairs. The administrator himself takes no such position.
 

 The lack of power of the administrator under the Federal statute to make a determination concluding the tenant-stockholders of plaintiff respecting the subject matter of this action demonstrates that the State court has not been divested of jurisdiction, a conclusion which is reinforced by the circumstance that no Federal forum is provided in which these
 
 *534
 
 equitable issues could be adjudicated. This conclusion is fortified by tlie expression by the Congress of an intention that the administrator’s power should be given effect through ownership of preferred stock in State corporations operating under State law.
 

 In
 
 Northridge
 
 the order appealed from is affirmed, with costs, and the question certified is answered in the affirmative.
 

 In
 
 Knolls
 
 the order appealed from is affirmed, with costs, and the question certified is answered in the affirmative.
 

 Conway, Ch. J., Desmond, Dye, Fuld, Froessel and Burke, JJ., concur.
 

 Orders affirmed, etc.
 

 [1]
 

 . The language of section 207 (subd. [b], par. [2]) of the National Housing Act (U. S. Code, tit. 12, § 1713, subd. [b], par. [2]) respecting the power of the administrator to approve rent charges relates by its terms to other kinds of enterprises as well as to co-operative corporations which are eligible for FHA mortgage insurance; consequently this subdivision includes phraseology adapted to other forms of organization which is inapplicable to co-operatives. The statement that the administrator may regulate or restrict the “rate of return”, for example, was clearly not intended to apply to co-operative corporations, such as plaintiff, inasmuch as they are required to be nonprofit after tenant-stockholders have acquired their interests therein. It would be contrary to the nature of a co-operative corporation for investors in it to receive a return on their investments. Therefore, if enterprises such as this are to be undertaken, the developers must be recompensed in some other manner, as through the sale or lease of property to the co-operative, construction of the building, or in some similar manner. In approving the leases of apartments in this co-operative, the administrator properly allowed nothing by way of a return on any investment of the developers in the co-operative corporation. It does not appear whether he was informed of the interest which the developers had in the real estate holding corporation or in the construction companies. It is clear that his practical construction of this statute recognizes that the only opportunity which was allowed for profit by the developers was by interpreting the statute as the Appellate Division has done. If the rental cost to the tenants would be too great, the administxator may refuse to recommend a project for FHA mortgage insurance. But there is nothing in itself illegal in a profit to the developers in the initial stages.
 

 [2]
 

 . This circumstance demonstrates that the cases are irrelevant to this controversy which are cited by appellants holding that the Interstate Commerce Commission or the Federal Power Commission have exclusive jurisdiction in rate-making eases (e.g.
 
 Montana-Dakota Co.
 
 v.
 
 Public Service Co.,
 
 341 U. S. 246;
 
 Glassberg
 
 v.
 
 Boyd,
 
 116 A. 2d 711 [Del.]). The only aspect of approval of a rent schedule by the FHA Administrator which could enter into the obligation of a lease by operation of law would be the establishment of a rent ceiling. If the common carrier or public utility rules were applicable, the administrator’s approval of a rent schedule would require tenants to pay more than the rent reserved in their leases if it were less than the scheduled figures, by the same token whereby shippers and consumers are hound by filed tariffs in common ■carrier or utility cases
 
 (Pennsylvania R. R. Co.
 
 v.
 
 Titus,
 
 216 N. Y. 17). Such tariffs are not analogous to these FHA rent schedules, which is a circumstance that illustrates the distinction between this situation and the eases cited by appellants.