[Civ. No. 45398. First Dist., Div. Two. Jan. 20, 1981.]

RAVEN'S COVE TOWNHOMES, INC., Plaintiff and Appellant, v.
KNUPPE DEVELOPMENT COMPANY, INC., et al.,
Defendants and Respondents.

784

COUNSEL

James E. Cooke, Julia P. Wald and Cooke & Mack for Plaintiff and Appellant.

Watson & Joiner, Joseph D. Joiner, Sedgwick, Detert, Moran & Arnold and Mark W. Hudson for Defendants and Respondents.

OPINION

TAYLOR, P. J.—This is an appeal by Raven's Cove Townhomes, Inc., a homeowners' association (Association), from a judgment of nonsuit in its action against Knuppe Development Company, Inc., the project developer (Developer) for strict liability and breach of warranty as to defects in common area landscaping, as well as in the exterior walls of individual units, and against the Developer and the Developer's employees as former directors in control of the Association, for breach of fiduciary duty by failing to properly determine operating costs and fund a maintenance reserve account. The major questions presented are: 1) the Association's standing to sue as representing a common interest subdivision (as defined by Bus. & Prof. Code, § 11000.1) pursuant to Code of Civil Procedure section 374, or in a representative capacity, pursuant to Code of Civil Procedure section 382; 2) the strict liability of the Developer and appropriate measure of damages pursuant to *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]; 3) the fiduciary liability of the Developer and its employees as former directors in control of the Association; and 4) attorney fees. For the reasons set forth below, we have concluded that the judgment must be reversed.

Viewing the record in favor of the Association, as we must on appeal from the nonsuit pursuant to Code of Civil Procedure section 581c (cf. *Smith* v. *Roach* (1975) 53 Cal.App.3d 893, 897-898 [126 Cal.Rptr. 29]), the following pertinent facts appear.

The Association is a nonprofit corporation whose members are the owners of 65 townhomes in the Raven's Cove development in Alameda, California. In November 1972, defendants, James and Barbara

Knuppe, the sole owners of the Knuppe Development Company, Inc.,[1] conveyed the common areas and facilities in fee simple to the Association. The Developer had been in the residential home building business for over 18 years and had built about 3,000 units, including several townhome developments, before Raven's Cove. The Developer acquired the undeveloped Raven's Cove site in April 1972. The site had been the place of fill activity for many years. The Developer added more fill in the fall of 1972. The overlying compoted fill is not generally characteristic of the native sandy soil.

The Association was incorporated by the Developer in 1972. In August 1973, the Developer recorded its grant deed of the common areas to the Association. By October 1973, construction had been substantially completed and sales commenced. Until May of 1974, when it was turned over to the homeowners, the Association was under the control of the Knuppes, who could not recall any functions that they performed, other than the signing of the Association's bylaws as officers.

The Association holds title to the common areas, including nearly two acres of lawns and shrubbery and landscaped areas. The Association also is responsible for maintenance and repair of the roofs and siding of the individual units, the common areas, and has the responsibility of assessing and collecting dues from the homeowners to establish: 1) an operating fund to pay current costs of upkeep, payment of water bills, and the cost of landscape maintenance personnel; 2) a replacement reserve fund for major costs, such as painting exterior surfaces of the individual units, replacement of roofs and major private street repairs. Replacement reserves have to be accumulated because the Association: 1) cannot assess its members a sufficient amount in a short period of time to pay for the work and materials required for major repairs and improvements; 2) cannot borrow funds for this purpose as the result of the nature of its assets. No reserve or operating funds were ever established or turned over to the Association.

There were serious defects in the landscaping and siding of Raven's Cove in 1974. As to the landscaping, expert testimony established that the problems with the soil, drainage and irrigation systems of the common areas which resulted in yellow lawns, dead olive trees and

---

[1]The other named defendants, T. A. McKee and J. W. Howard, were employees of Knuppe. Defendant, United Pacific Insurance was the surety on the bonds for the completion of the common areas of Raven's Cove, and is no longer a party.

unhealthy plants, were the result of the Developer's failure to properly prepare the soil. The soil conditions were not appropriate for the desired landscaping; the soil contained a lot of clay, base rock and in most areas was not more than three or four inches deep before hitting hard pan or base rock. In some areas, there was no soil. The Associations' expert, a landscape architect, testified that the soil type was not proper for the growth of plant materials, as the roots of plants could not penetrate the soil. In addition, the progressive land fill resulted in problems of compaction. The differences in soil textures created layering and improper subsurface drainage for the plants. He opined that although 12 inches was the reasonably satisfactory depth for lawn planting material, the problem could be solved by removing the present shallow top soil layer over the hardpan and replacing it with an 8-inch depth of planting material.

Further, the drainage and irrigation system installed at Raven's Cove varied from the plans and specifications of the Developer's landscape architect. The wrong sprinkler heads were installed so that there was inadequate watering in some areas and too much irrigation in others. In a number of areas, the sprinklers watered the buildings, sidewalks and streets. The irrigation system delivered the same quantity of water to shady, sunny and windswept areas, and to all kinds of plants without adjustment for the differing requirements of trees, lawns and shrubbery. The Association's experts estimated that the costs of correcting the landscaping defects would range from about $219,000 to $240,000; this estimate included redesigning the irrigation system, replacing the olive trees and correcting the lawns.

As to the siding, a painting contractor reaffirmed the testimony of homeowners and property managers as to the conditions of the siding and trim of the individual units. The unpainted siding was decomposing from water and rusting, blacking and mildew, which in some areas was caused or exacerbated by improper sprinkler placement. Apart from mildew, an unpainted wood surface will eventually break down. The use of ungalvanized nails in the trim caused deterioration in the paint and premature chalking in 1974, shortly after the turnover of the Association, as well as seeping rust from the nails. Galvanized nails are customarily used on all exterior surfaces in well constructed projects. He estimated that it would cost between $8,000 and $9,000 to paint the siding, and $17,640 (at $256 for each of the 65 units) to repaint the trim on the individual units.

The instant action was commenced by the Association in 1976. The amended complaint alleged eight causes of action for declaratory relief, strict liability and for breach of warranty as to the landscaping of the common areas and the defects in the individual units, and breach of fiduciary duties by the initial Association directors for failing to establish an adequate reserve fund.

In granting the Developer's motion for nonsuit, the trial court specified three grounds: as to the causes of action involving the individual units on the ground that the Association lacked standing; involving the common areas on the ground that there had been no proof of out-of-pocket loss; and against the individual directors on grounds of no breach of fiduciary or other duties.

■ The first major contention on appeal pertains to the standing of the Association to sue for the landscaping defects in the common areas and the defects in the exteriors of the individual units. As a general rule, a homeowners' association has no standing to sue unless it has an ownership interest in the property by the association or an express statutory grant to bring the suit (*Friendly Village Community Assn., Inc. v. Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220 [107 Cal.Rptr. 123, 69 A.L.R.3d 1142]). The Developer erroneously asserts that *Friendly Village* states the law applicable here. The Developer's argument overlooks the significant distinguishing factor between Raven's Cove and the condominium type of development involved in Friendly Village, namely, here the Association owns the common areas. Thus, there can be no question that here, at least as to the common areas, the Association has standing pursuant to Code of Civil Procedure section 374,[2] which was enacted in 1976 in response to Friendly Village to provide that owners' associations in projects of condominiums, community apartments and undivided interest subdivisions have standing to sue for damages to commonly owned areas.

[2]The statute, as originally enacted, became effective on August 27, 1976, and read as follows: "An owner's association established in a project consisting of condominiums, as defined in Section 783 of the Civil Code, or of a community apartment project, as defined in Section 11004 of the Business and Professions Code, or *an undivided interest subdivision project, as defined in Section 11000.1* of the Business and Professions Code, *shall have standing to sue as the real party in interest for any damages to the commonly owned lots, parcels, or areas occasioned by the acts or omissions of others, without joining with it the individual owners of such project.*" (Stats. 1976, ch. 595, § 2; italics added).

Although the instant complaint was filed on May 6, 1976, before the above effective date, the parties here apparently concede that the statute is properly retroactively applicable to the instant case.

■ The Association maintains that Raven's Cove is an undivided interest subdivision project, as defined by Business and Professions Code section 11000.1, set forth, so far as pertinent, below.[3] Business and Professions Code section 11000.1 adds to the definition of "subdivided lands" and "subdivision," for purposes of regulation of offers or sales of such subdivision, the creation of five or more undivided interests in improved or unimproved land. As indicated above, at Raven's Cove, the interests are specifically divided between the Association, which is the sole owner of the common area[4] and facilities, and its homeowner members, who are the sole owners of their individual residential units. Thus, there are no undivided interests to bring the Association within the purview of Code of Civil Procedure section 374, as originally enacted.

The Association, however, argues that it is a planned development, as defined by Business and Professions Code section 11003, set forth below,[5] and purports to rely on the 1979 amendment to Code of Civil Procedure section 374 by which the Legislature specifically gave stand-

---

[3]"(a) 'Subdivided lands' and 'subdivision,' as defined by Sections 11000, 11000.5, and 11004.5, *also includes improved* or unimproved land or lands, *lot* or lots, or parcel or parcels, of any size, *in which, for the purpose of sale* or lease or financing, whether immediate or future, *five or more undivided interests are created* or are proposed to be created. [¶] (b) This section shall not apply to the creation or proposed creation of undivided interests in land if any one of the following conditions exist: [¶] (1) The undivided interests are held or to be held by persons related one to the other by blood or marriage" (italics added).

[4]The Association's ownership of the common areas distinguishes the instant form of "undivided" subdivision from: 1) a condominium-type in which owners own the individual unit in fee and also have an undivided interest as tenants in common in the facilities used by all of the owners (Civ. Code, §§ 783, 1350); 2) a cooperative association which typically each member owns a share in a cooperative association which gives the member the right to occupy one of the units owned in common by the association (15A Am.Jur.2d, Condominiums and Co-operative Apartments, § 2).

[5]"A *'planned development'* is a real estate development, as defined in Section 11003.1 of this code, other than a community apartment project as defined in Section 11004 of this code, a project consisting of condominiums as defined in Section 783 of the Civil Code, or a stock cooperative, as defined in Section 11003.2 of this code, having either or both of the following features: [¶] (a) Any contiguous or noncontiguous lots, parcels or areas owned in common by the owners of the separately owned lots, parcels or areas consist of areas or facilities the beneficial use and enjoyment of which is reserved to some or all of the owners of separately owned lots, parcels or areas. [¶] (b) Any power exists to enforce any obligation in connection with membership in the owners association as described in Section 11003.1 of this code, or any obligation pertaining to the beneficial use and enjoyment of any portion of, or any interest in, either the separately or commonly owned lots, parcels or areas by means of a levy or assessment which may become a lien upon the separately owned lots, parcels, or areas of defaulting owners or members, which said lien may be foreclosed in any manner provided by law for the foreclosure of mortgages or deeds of trust, with or without a power of sale." (Italics added.)

ing to associations of planned developments.[6] The 1979 amendment, while not applicable here, is but one factor in determining the meaning of the 1974 version (*Eu* v. *Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 787 [138 Cal.Rptr. 378]). In any event, the subsequent amendment further undermines the viability of *Friendly Village, supra*, 31 Cal.App.3d 220, on which the Developer relies.

The Association argues that subsequent statutory changes have been held to provide a sufficient reason for departing from precedent, particularly where, as here, public policy considerations are involved (*People* v. *Valentine* (1946) 28 Cal.2d 121, 144 [169 P.2d 1]; *Hunt* v. *Authier* (1946) 28 Cal.2d 288, 295 [169 P.2d 913, 171 A.L.R. 1379]; cf. *Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 520-521 [143 Cal.Rptr. 247, 573 P.2d 465]). The rationale for allowing homeowners' associations to bring suit is that "if the association does not have standing, the costs of prosecution of the case would not be a common expense, thus greatly increasing the difficulty of individual owners seeking redress against a corporate defendant (see Hyatt & Rhoads, *Concepts of Liability in the Development and Administration of Condominium and Homeowners' Associations* (1976) 12 Wake Forest L.Rev. 915, 975). Here, as indicated above, the Association has the obligation to maintain and repair the common areas and the exteriors of the individual units specifically referred to in the 1979 amendment.

As the Association urges, the 1979 amendment reflects a legislative tendency to enlarge rather than restrict the groups of persons and the causes of action available (cf. *Hunt* v. *Authier, supra*, 28 Cal.2d, at p. 291). We do not think, however, that the public policy considerations here are as compelling as those present in *Henrioulle, supra*, 20 Cal.3d 512. Further, the very specific language of the 1979 amendment pertaining to planned development associations and their causes of action for damages to common areas as well as to individually owned lots,[7] and

---

[6]The 1979 amendment (Stats. 1979, ch. 168 § 1) became effective on January 1, 1980, after the entry of the judgment in the instant case and, therefore, is not directly before us (*People's Home Sav. Bank* v. *Sadler* (1905) 1 Cal.App. 189, 193 [81 P. 1029]). We note that the very specific language of the 1979 amendment gives associations of planned developments standing to sue for damages to common areas, as well as individual units.

[7]As amended in 1979, Code of Civil Procedure section 374, now reads: "An owners' association established in a project consisting of condominiums, as defined in Section 783 of the Civil Code, or of a community apartment project, as defined in Section 11004 of the Business and Professions Code, an undivided interest subdivision project,

the relative newness of the kind of real property interests involved, prevent us from reasonably construing the 1979 amendment as one that merely clarifies existing law rather than changing it. We hold, therefore, that the trial court properly concluded that the Association did not have standing as to the cause of action for damage to the individual units pursuant to Code of Civil Procedure section 374 prior to the 1979 amendment.

■ The next question is whether the Association has standing to sue in a representative capacity pursuant to Code of Civil Procedure section 382, which provides, so far as pertinent: "... when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, *one or more may sue or defend for the benefit of all.*" (Italics added.)

The Developer grudgingly concedes that the Association has the proper *capacity* to sue and would be a proper class representative, but argues that it has not satisfied the requirements for *standing* to maintain a class action.[8] We do not consider apposite the Developer's authorities related to class actions. However, we need not deal with the question of whether the Association's cause of action for the defects in the individual units qualifies as a class action. Pursuant to Code of Civil Procedure section 382 the Association has the requisite standing in a *representative* capacity. The leading authority is *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117 [109 Cal.Rptr. 724]. In Beverly Glen, a nonprofit corporation composed of families residing in an area that would be adversely affected by a proposed development, was held to have standing to sue in a representative capacity; there, as in the instant case, there were no express allegations that the nonprofit corporation was duly authorized to sue or that it brought the action in its representative capacity. The court reviewed the applicable precedents, at pages 120-126, and noted, at page 122, that there had been a "marked accommodation of formerly strict procedural requirements of standing to sue ... where matters relating to the '*social and economic realities of the present-day organization of society*'

as defined in Section 11000.1 of the Business and Professions Code, or a planned development, as defined in Section 11003 of the Business and Professions Code, shall have standing to sue as the real party in interest for any damages to commonly owned lots, parcels, or areas or individually owned lots, parcels, or areas which the owners' association is obligated to maintain, preserve, or repair occasioned by the acts or omissions of others, without joining with it the individual owners of such project or development.

[8]"Standing" refers to the requisite interest to support an action or the right to relief and is distinct from "capacity" (*Friendly Village, supra*, 31 Cal.App.3d, at p. 224).

... *are concerned.*" (Italics added.) This observation is particularly apt here since one of the present-day social and economic realities is that today the typical homeowner in California owns a real property interest in a planned development, condominium, cooperative, or other similar interest, rather than the detached single family home of the post-World War II years.[9]

The same is true in other states which have experienced a "phenomenal growth" in condominium-type housing (see *Point East Man. C. v. Point East One Condominium C., Inc.,* (Fla. 1973) 282 So.2d 628 [73 A.L.R.3d 603, at p. 611]). As we indicated in *Kriegler* v. *Eichler, supra,* 269 Cal.App.2d 224, 227: "The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping legal principles abreast of the times."

The court in *Beverly Glen, supra,* 34 Cal.App.3d 117, stated at page 129: "Whether or not a representative plaintiff does and can in fact adequately represent others is a question of fact for the trial court. And if the trial court decides that a named plaintiff cannot suitably represent the class, it should afford an opportunity for amendment (*La Sala* v. *American Sav. & Loan Assn.,* 5 Cal.3d 864, 872 . . . ). It may also be true that while all class suits are representative in nature, *all representative suits are not necessarily class actions.* (Compare the type of class action exemplified by *La Sala* v. *American Sav. & Loan Assn., supra* [97 Cal.Rptr. 849, 489 P.2d 1113], and by *Vasquez* v. *Superior Court,* 4 Cal.3d 800 . . ., with those set forth in *Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276 [32 Cal.Rptr. 830, 384 P.2d 158]; *Diaz* v. *Quitoriano, supra,* 268 Cal.App.2d 807 [74 Cal.Rptr. 358], and *Santa Clara County Contractors etc. Assn.* v. *City of Santa Clara, supra,* 232 Cal.App.2d 564 [43 Cal.Rtpr. 86]. See also Los Angeles Superior Court Class Action Manual, § 404.)" (Italics added.)

Arguably, *Beverly Glen* is limited to the "environmental concerns" there in issue. Even if so, the interests of the Association and its mem-

---

[9]We also may take judicial notice of a letter dated November 22, 1978, from the Department of Real Estate (Department) providing figures from an official study indicating the rapid growth of this form of home ownership. The Department estimated as of that date that there were over 10,000 homeowner associations in existence in this state and they were being created at the approximate rate of 160 per month, producing a projection of at least 19,000 more of these associations in the next 10 years. (Evid. Code, §§ 450, 453, 454.)

bers here affected by the conduct of the Developer are "environmental," although in a sense somewhat narrower than its customary use. Furthermore, a subsequent opinion of the same appellate district that decided *Beverly Glen* indicates that the case is not to be narrowly confined to its own set of facts and circumstances. In *Salton City etc. Owners Assn.* v. *M. Penn Phillips Co.* (1977) 75 Cal.App.3d 184 [141 Cal.Rptr. 895], the court discussed *Beverly Glen* and held at pages 188-189, that an association of persons who had entered into land sale contracts with the defendants had standing not only in a representative capacity but also was in essential nature a proper (although somewhat unorthodoxly defined) class action. The court reiterated at page 187 that a plaintiff's standing to sue as a representative should be considered in the light "of the particular plaintiff's ability to fairly protect the rights of the group he purports to represent." The court also reiterated the distinction between class and representative actions, and continued at page 191: "In either instance, however, *justification* for the procedural device whereby one may sue for the benefit of many *rests on considerations of necessity, convenience and justice.*" (Italics added.) We note that our Supreme Court subsequently denied a hearing in *Salton City.*

The two requirements that must be satisfied for a *representative* action are an ascertainable class and a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732]; *Salton City, supra*, 75 Cal.App.3d 184). The Association was formed for the purpose of providing "maintenance, preservation and architectural control of the residence Lots and Common Area . . . and to promote the health, safety and welfare of the residents. . . ." The Association has filed this action on behalf of its homeowner members who all have a beneficial interest in the result of this case. We think that here, as in *Salton City, supra*, considerations of necessity, convenience and justice under the circumstances provide ample justification for the use of the representative procedural device.

Even assuming that pursuant to *Salton City*, the cause of action here in issue qualifies as a class action, we note that the court in *Salton City*, at page 191, disposed of the notice requirement urged by the Developer and remanded the case to the lower court to determine whether the property owners' association could fairly and adequately represent its members. We also note that in *Deal* v. *999 Lakeshore Ass'n.* (1978) 94 Nev. 301 [579 P.2d 775], the court found a sufficient community of in-

terest for a class action among the owners of condominium units who sued the developer for damages for roof leakage, improper drainage and inadequate exterior staining. The Nevada court noted at page 778 that while not every owner had a leaky roof, leaks occurred in every one of the 10 buildings and all units were assessed for repairs to the common roof area.

We conclude that the Association has standing to sue in a representative capacity for the damage to the individual units pursuant to Code of Civil Procedure section 382.

In view of the above conclusion, we need not discuss in greater detail the Developer's contentions concerning the alleged difficulties of ascertainment of the class. We merely note that present and former owners of recorded real property interests, like those held by the Association's members here, present a far more easily and readily ascertainable class than random users of taxicabs (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 704).

■■ Next, we turn briefly to the Developer's contention that the Association failed properly to prove by expert testimony that the Developer had not met the industry standard as to the quality of landscaping in the common areas and exterior surfaces. This contention is not properly before us, as it was not among the grounds for the nonsuit stated by the court below. "If the court *grants* the motion [for nonsuit], the appealing plaintiff should be able to insist that the reviewing court confine its consideration to the grounds specified below notwithstanding the existence of other good grounds; otherwise, he is deprived of the opportunity to correct defects" (4 Witkin, Cal. Procedure (2d ed.) Trial, § 362, p. 3159; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 94 [147 P.2d 604]).

In any event, the Developer has misconceived and misstated the law. Here, no testimony was necessary for the jury to be able to determine whether there were defects in the real property that Developer created at Raven's Cove. The defects were of a nature that could be ascertained by a lay jury without the aid of experts.

In *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], a strict liability case, our Supreme Court specifically denied the need to define "defectiveness" for the trier of fact by introduction of evidence of some standard set by knowledgeable individ-

uals for the manufacture and use of a particular part under scrutiny, or to have such an expert testify to something more than "his own unilateral standard" (pp. 125-126).

The record indicates that here, following *Cronin*, the Association adduced testimony by lay and expert witnesses which was sufficient to show that the irrigation system, the landscaping, and the paint and exterior trim failed to fulfill their respective purposes. *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689 [106 Cal. Rptr. 1, 505 P.2d 193], cited by the Developer, is readily distinguishable from the instant facts. In *Miller*, the court held at page 701 that plaintiff must introduce expert testimony to establish the "practices of builders in the area in order to establish the proper standard of care" applicable to a defendant-builder. The court reasoned that the average layman ordinarily cannot determine defectiveness where it involves not only "the erection of the structure itself but also . . . the location of the house on a particular lot, the elevation of the lot, the influence of the surrounding terrain, the possibility of run-offs and floods, and the existence of the debris dam" (p. 703). Thus, the issues to be determined by the jury in *Miller* were sufficiently complex to warrant expert testimony. Further, *Miller* stated at page 702 that the test for whether experts are required is as follows: "'the decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'"

Applying this test to the instant facts summarized above, it is clear that the defects complained of by the Association were of a kind which are of such common knowledge that men of ordinary education could easily recognize them.

■ We turn next to the Association's second cause of action for breach of fiduciary duty as a result of the failure of the Association's initial board of directors to fund an adequate reserve account for contingencies.

The record indicates that the Developer paid the ordinary costs of maintenance until the Association was turned over to the homeowners after the last unit was sold in May of 1974. The uncontroverted evidence established that the Developer and its employees (who were the

incorporating directors and initial officers) totally controlled the Association until May 1974. It is uncontroverted that until the turnover, all directors[10] of the Association were either the owners or employees of the Developer. As a result of its prior experience, the Developer had learned that it was unwise to turn an Association over to "inexperienced homebuyers" and "expect them to run a business." Accordingly, the Developer recommended a professional manager who was employed on the night that the homeowners first were elected to the board of the Association. Six months later, the homeowners' board independently selected and employed a new manager. The new manager had to sue to obtain the Association's financial records from the former manager.

As indicated above, in 1974, no reserve or operating funds had been created; thus, none were turned over to the Association. As a result, the homeowners had to vote a dues increase for operating costs only. Thus, no funds were available to be set aside for reserves, although in one instance $35 had been set aside in escrow for this purpose. Generally, maintenance reserves are set aside for the purpose of roof replacement, painting and long-term maintenance, and the reserve fund is ordinarily commenced with the conveyance of the common area. At Raven's Cove, the conveyance of the common area occurred in 1973 simultaneously with the sale of the first unit.

The Developer here knew that the bay front exposure of Raven's Cove created particular maintenance problems as to the paint and exterior trim which were the result of severe wind and salt spray exposure of the site. A replacement reserve is a portion of the overall operating budget; in preparing it, the components of the operating budget are used to consider "all those things that will wear out, fall apart, need to be replaced or repaired substantially." Each purchaser at Raven's Cove received copies of the Association's articles and the 1972 estimated operating budget, which set forth a contingency fund comprised of $28-$30 per unit per month. The Association's expert testified that $10 per unit would have been a more reasonable initial replacement reserve budget; by the time of trial, the assessment should have been $15 a month per unit.

The record indicates that pursuant to the declaration of convenants, conditions and restrictions signed by the Developer and each home-

---

[10]The owner of the Developer could not recall who had served as the president of the Association in this initial period. The record indicates that the owner and his wife were two of the five incorporating directors; she executed the bylaws as secretary for the Association.

owner at the time of purchase, monthly assessments were to start with the conveyance of the common areas to the Association. Necessarily, at the time of purchase, Raven's Cove homeowners bought as yet uncompleted landscaped units. We note that the problems that developed at Raven's Cove have been pervasive as to the common areas of townhouse developments (12 Wake Forest L.Rev., *supra*, p. 957).

The parties have not cited, and our research has not disclosed, any specific authority in this state. Nevertheless, it is well settled that directors of nonprofit corporations are fiduciaries. The statutory provisions here applicable are former Corporations Code section 9002[11] which provided that the provisions of the general corporations law were applicable to nonprofit corporations. The pertinent provision was former general Corporations Code section 820, which required directors and officers to "exercise their powers in good faith, and with a view to the interests of the corporation."

Of particular significance is the conflict of interest presented where, as here, the owner of the Developer and his wife and major coowner, are also directors of the Association in its infancy, along with the Developer's employees. We note that the duty of undivided loyalty (see Scott, *The Fiduciary Principle* (1949) 37 Cal. L.Rev. 539) applies when the board of directors of the Association considers maintenance and repair contracts, the operating budget, creation of reserve and operating accounts, etc. ■ Thus, a developer and his agents and employees who also serve as directors of an association, like the instant one, may not make decisions for the Association that benefit their own interests at the expense of the association and its members (cf. *Northridge Coop. Sec. No. 1* v. *32nd Ave. C. Corp.* (1957) 2 N.Y.2d 514 [161 N.Y.S.2d 404, 141 N.E.2d 802]; *Shore Terrace Cooperative, Inc.* v. *Roche* (1966) 25 App.Div.2d 666 [268 N.Y.S.2d 278]; *Ireland* v. *Wynkoop* (Colo.App. 1975) 539 P.2d 1349, 1357). In most jurisdictions, the developer is a feduciary acting on behalf of unknown persons who will purchase and become members of the association (Note, *Florida Condominiums—Developer Abuses and Securities Law Implications* (1973) 25 U. Fla. L.Rev. 350, 355).

[11]Former Corporations Code section 9002 was repealed and superseded by Statutes of 1978, chapters 567 and 1305, which enacted a new Nonprofit Corporation Law beginning with section 5000, operative January 1, 1980. The pertinent provision of the new law is section 5231, which sets forth the good faith duties of directors in greater detail than the prior law.

 We also find persuasive the following comment on the specific problem here presented. "[I]ndividuals on the board are held to a high standard of conduct, the breach of which may subject each or all of them to individual liability .... Where a developer or sponsor totally dominates the association, or where the methods of control by the membership are weak or nonexistent, 'closer judicial scrutiny may be felt appropriate,' and the principles of fiduciary duty established with business corporations 'may exist for holding those exercising actual control over the group's affairs to a duty not to use their power in such a way as to harm unnecessarily a substantial interest of a dominated faction.'" (12 Wake Forest L.Rev. 915, 923.) We are indebted for our approach to these problems to the thoughtful and insightful discussion of the specific issues in the Wake Forest Law Review cited above, which aptly continues at page 976: "The subject of fiscal responsibilities, *e.g.*, 'low-balling' failure to pay assessments on unsold units, the failure to enforce the obligation to pay, is one of the areas of great developer exposure." The article also points to the necessity for good management—with adequate books, records and minutes (see also Annot., Self-Dealing by Developers of Condominium Project As Affecting Contracts or Leases With Condominium Association (1976) 73 A.L.R.3d 613)..

We also find helpful the reasoning of *Stern* v. *Lucy Webb Hayes Nat. Train. Sch. for Deacon. & M.* (D.D.C. 1974) 381 F.Supp. 1003, at page 1014, in which the less stringent corporate rules were applied to the directors of a charitable corporation to require due diligence in the supervision of the actions of officers, employees and outside experts over whom they had responsibility under a standard of honesty, good faith and a reasonable amount of diligence and care.

We think that here, the failure of the initial Association directors to exercise supervision which permits mismanagement or nonmanagement is an independent ground for the breach of fiduciary duty by the Developer during the initial period of the Association, when the Developer and its employees controlled the Association.

Here, the initial directors and officers of the Association had a fiduciary relationship to the homeowner members analogous to that of a corporate promoter to the shareholders. These duties take on a greater magnitude in view of the mandatory association membership required of the homeowner. We conclude that since the Association's original directors (comprised of the owners of the Developer and the Developer's employees) admittedly failed to exercise their supervisory and manage-

rial responsibilities to assess each unit for an adequate reserve fund and acted with a conflict of interest, they abdicated their obligation as initial directors of the Association to establish such a fund for the purposes of maintenance and repair. Thus, the individual initial directors are liable to the Association for breach of basic fiduciary duties of acting in good faith and exercising basic duties of good management.

■ As the Developer concedes that if the Association has standing and adduced sufficient evidence, the applicable theory is strict liability, as first delineated by our seminal decision in *Kriegler* v. *Eichler Homes, Inc., supra,* 269 Cal.App.2d, at pages 227-228, we turn to the question of the appropriate measure of damages in this case. This question also appears to be one not previously faced by an appellate court in this state in a published opinion.

The record indicates that the trial court, believing that the only proper measure of damages was the "out of pocket" rule (Civ. Code, § 3343), refused an instruction allowing damages equal to the cost of repairs. The record also indicates that the court's ruling was based on its misapprehension that the Association had failed to prove fraud, which is the prerequisite for damages pursuant to Civil Code section 3343.[12]

Here, the applicable statute is Civil Code section 3333, set forth below,[13] which sets forth the measure of damages for actions in tort. In *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607 [77 Cal.Rptr. 633], the developer of a lot was held strictly liable for damages suffered by the owner when the rear slope of the plaintiffs' lot failed as a result of uncompacted fill and inadequate drainage. The court, relying on *Kriegler, supra,* 269 Cal.App.2d 224, indicated that the cost of repair pursuant to Civil Code section 3333 was the proper measure of damages. The purpose of tort damages is to make the injured plaintiff whole (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 842, p. 3137).

---

[12]For the same reason, *Gagne* v. *Bertron* (1954) 43 Cal.2d 481 [275 P.2d 15], cited by the Developer, is inapposite. *Gagne* held that the out-of-pocket rule applies to determine damages to plaintiffs who had purchased lots in reliance on defendant's representation as to the amount of fill thereon. Here, of course, the Association does not rely primarily on a fraud theory but on strict liability.

[13]Civil Code section 3333: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

While, as Witkin also points out, the normal measure of damages for injuries to real property is the difference between the market value of the land before and after the injury, "[a]nother permissible measure is the reasonable cost of *repair* or restoration of the property to its original condition, together with the value of the lost use during the period of injury" (Witkin, *supra*, Torts, § 919, p. 3204). This is the correct and practical approach here. Contrary to the Developer's contention, nothing in *Kriegler, supra*, or *Sabella* v. *Wisler* (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889], suggests that diminution in value is the only measure. We note that *Sabella* followed *Stewart* v. *Cox* (1961) 55 Cal.2d 857 [13 Cal.Rptr. 521, 362 P.2d 345], in which a builder was held liable for damages measured by the cost of repairing the damage proximately caused by his negligence. Other commentators agree that regardless of the theory of liability relied upon by a plaintiff, if judgment is rendered against the contractor for construction defects, the proper measure of damages is the cost of repair to the plaintiff's property (Miller & Starr, Current Law of Cal. Real Estate, § 9:20, p. 475; see also 8 Pacific L.J. 211 (1977).

The Developer's reliance on *Overgaard* v. *Johnson* (1977) 68 Cal. App.3d 821 [137 Cal.Rptr. 412], to support the out-of-pocket rule is inapposite, since the reasoning of the case supports the Association's position. *Overgaard* was an action for negligence brought by the sellers of real property against a real estate salesman and broker for damages due to misrepresentation of the acreage involved in the sale. The court held, however, that Civil Code section 3333 provided the proper measure of damages and that plaintiffs were entitled to damages measured by the *actual loss suffered* (pp. 827-828).

We hold, therefore, that the proper measure of damages here is the cost of remedying the defects in the landscaping and repairing of the homeowners' individual properties, together with the value of the lost use (if any) during the period of injury. Accordingly, we need not discuss the parties' contentions concerning damages based on other theories of liability.

■ Finally, we turn briefly to the Association's contention that it is also entitled to its attorney fees on this appeal pursuant to the provisions of the Association's declaration of "Covenants, Conditions and Restrictions." The pertinent portions of the declarations stated: 1) all of their covenants ran with the property and were binding on all parties and successors (preamble); and 2) that for each lot, the Developer cov-

enanted that there would be paid to the Association annual assessments and special assessments for capital improvements, and that if the Association had to take legal action to enforce its rights to assessments, these assessments, along with attorney fees, were to be a charge on the land, a continuing lien against the property and the personal obligation of "the person who was the Owner of such property at the time when the assessment fell due" (art. IV, § 1, p. 6).

Attorney fees on appeal are recoverable where, as here, they are authorized by the contract of the parties. The above mentioned provisions of the declarations clearly authorize attorney fees on appeal for the cause of action pertaining to the breach of fiduciary duties discussed above (6 Witkin, Cal. Procedure (2d ed. 1971) § 587, p. 4518). Here, the Association filed the breach of duty cause of action to enforce the provisions of the declarations (*Heidt* v. *Miller Heating & Air Conditioning Co.* (1969) 271 Cal.App.2d 135, 137-138 [74 Cal.Rptr. 695]). Since we have jurisdiction to make the award, we note that the issue, while one of law and first impression, was not particularly well briefed or discussed extensively on appeal. Accordingly, we think the Association is entitled only to nominal attorney fees for raising the fiduciary duty issue on this appeal. On remand, the trial court is to determine the appropriate amount.

The judgment of nonsuit is reversed. The trial court is to determine the approximate amount of nominal attorney fees on appeal.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied February 19, 1981, and respondents' petition for a hearing by the Supreme Court was denied April 16, 1981.