[No. D008568. Fourth Dist., Div. One. Jan. 29, 1990.]

GERALD Q. ORNDORFF et al., Plaintiffs and Respondents, v. CHRISTIANA COMMUNITY BUILDERS et al., Defendants and Appellants.

684

**COUNSEL**

A. Daniel Bacalski, Jr., Billie J. Jaroszek, Patrick L. Prindle and Bacalski, Holdway & Prindle for Defendants and Appellants.

Richard D. Bregante, Andrew F. Lloyd, Ann M. McMenomy and Duke, Gerstel, Shearer & Bregante for Plaintiffs and Respondents.

## OPINION

### BENKE, Acting P. J.—

#### INTRODUCTION

Plaintiffs have lived in their home since 1977. They have no plans to leave it. Unfortunately their home was built on defectively compacted soil. The plaintiffs presented evidence, and the trial court found, it will cost $243,539.95 to repair the defects and relocate the plaintiffs while the necessary repairs are being completed. Their appraiser testified that after their home is repaired it will be worth $238,500. The trial court awarded the plaintiffs their repair and relocation expenses as compensation for the damage caused by the defective soil.

On appeal the defendants, who stipulated the home was built on defectively compacted soil, argue the trial court should have awarded the plaintiffs only the amount by which the defects had diminished the value of the home.

In light of the plaintiffs' intention to stay in their home, proof of its substantial value after repairs, and the extent of damage caused by the defect, we believe the trial court had discretion to award plaintiffs their repair costs and relocation expenses. Accordingly, for the reasons we explain more fully below, we affirm.

#### SUMMARY OF THE CASE

On November 14, 1985, plaintiffs Gerald Q. Orndorff and Roberta G. Orndorff filed a complaint against defendants Christiana Community Builders (Christiana) and Ponderosa Homes (Ponderosa). They alleged claims for breach of implied warranty, strict liability, negligence, fraud and violation of building codes. The defendants answered the complaint, denying its material allegations.

Trial without a jury commenced on April 25, 1988. At trial the parties stipulated "The subject property including lots, structures and improvements thereon exhibit distress as a result of fill settlement. As such, the lots, structures and improvements are defective." While agreeing the house was suffering the effects of fill settlement, the parties disputed whether further settlement was likely to occur and what method of repair was needed.

The Orndorffs presented evidence that further settlement was likely and that, in light of future settlement, a pier or caisson and beam system were

necessary to repair their house. The Orndorffs' expert estimated it would cost $221,792.68 to install such a system. In addition to the cost of repair, the Orndorffs presented evidence they would be required to incur $21,747 in additional engineering costs, permit fees and relocation expenses while the repairs were completed.

The defendants presented evidence that no future settlement was likely and that, accordingly, a reinforced mat repair system would be sufficient. The cost of such a system would be $118,355.

The parties also disagreed about the value of the Orndorffs' home before and after any repair. The Orndorffs' appraiser testified that without repairs the home was worth $67,500 and that with repairs it would be worth $238,500. On the other hand the defendants' appraiser testified that without repairs the home was worth $160,500 and that with repairs it would be worth only $225,500.

Finally, the Orndorffs testified they had lived in the house for 11 years and had no desire to leave it. Gerald testified that when he and his wife bought the house they paid a premium because the house was located immediately adjacent to an open space easement. Gerald and Roberta each testified that if awarded the repair costs they would in fact repair their home. According to Roberta "I really like the house, I really hadn't planned on moving."

After considering the evidence presented by the parties and inspecting the Orndorffs' home, the trial judge issued a statement of decision. He found the measure of damages for construction defects was either the diminution in value or the likely repair costs and that in this case an award of repair costs, plus relocation expenses, was appropriate. He found fill settlement was likely to continue and that a pier or caisson and grade system were the most efficient method of repair. Thus he awarded the Orndorffs the $243,539.95 needed to install a pier and grade system and pay the Orndorffs' relocation expenses while the repairs were performed.[1]

Judgment was entered on June 2, 1988, and the defendants filed a timely notice of appeal.

### Issue Presented

On appeal the defendants argue the measure of damages in construction defect cases is the lesser of the diminution in value caused by the defect or

---

[1] The trial judge denied the Orndorffs any recovery on their claims for emotional distress.

the cost of repair. Since the Orndorffs' appraiser testified their home was worth $67,500 without repair and would be worth $238,500 following repairs, the defendants claim the trial court had no power to award more than the $171,000 diminution in value established by the Orndorffs' appraiser.

In their reply brief the defendants also argue the trial court erred because it gave the Orndorffs an amount needed to repair the defect, rather than an amount needed to repair the damage caused by the defect.

## DISCUSSION

## I

### *Measure of Damages*

We do not find the law as rigid as the defendants suggest. Where, as here, the plaintiffs have a personal reason to repair and the costs of repair are not unreasonable in light of the damage to the property and the value after repair, costs of repair which exceed the diminution in value may be awarded. (See *Heninger v. Dunn* (1980) 101 Cal.App.3d 858, 863-866 [162 Cal.Rptr. 104] (*Heninger*).) In *Heninger* the defendants bulldozed a road over the plaintiffs' land. The road damaged or killed 225 of plaintiffs' trees and destroyed much vegetative undergrowth. However because of improved access the trial court found the road actually increased the value of the land from $179,000 to $184,000. The trial court also found it would cost $221,647 to replace the dead or dying trees and that the undergrowth could be restored for $19,610. Because the value of the property had been increased, the trial court denied the plaintiffs any award of damages.

The Court of Appeal reversed and remanded. In rejecting the trial court's rigid approach to damage calculation, the Court of Appeal stated: "The rule precluding recovery of restoration costs in excess of diminution in value is, however, not of invariable application. Restoration costs may be awarded even though they exceed the decrease in market value if 'there is a reason personal to the owner for restoring the original condition' (Rest.2d Torts, § 929, com. b, at pp. 545-546), or 'where there is reason to believe that the plaintiff will, in fact, make the repairs' (22 Am.Jur.2d, Damages, § 132, at p. 192)." (*Heninger, supra,* 101 Cal.App.3d at p. 863; see also *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 801-802 [171 Cal.Rptr. 334].) After analyzing two California cases which had involved closely related damages disputes[2] and noting that no California

---

[2] See *DeCosta* v. *Massachusetts Mining Company* (1861) 17 Cal. 613, 617; *Dandoy v. Oswald Bros. Paving Co.* (1931) 113 Cal.App. 570, 572-573 [298 P. 1030].

case had rejected the "personal reason" exception, the *Heninger* court concluded "the exception is viable in California." (*Heninger, supra,* 101 Cal.App.3d at p. 864.)

In *Heninger* the court also discussed a number of cases from other jurisdictions which allowed similar recoveries in cases involving destruction of shade or ornamental trees which were of personal value to their owners. "Where such trees or shrubbery are destroyed by a trespasser, '[s]ound principle and persuasive authority support the allowance to an aggrieved landowner of the fair cost of restoring his land to a reasonable approximation of its former condition, without necessary limitation to the diminution in the market value of the land . . . .' [Citations.] If restoration of the land to a reasonable approximation of its former condition is impossible or impracticable, the landowner may recover the value of the trees or shrubbery, either as timber or for their aesthetic qualities, again without regard to the diminution in the value of the land. [Citations.] The overall principles by which the courts are to be guided are 'flexibility of approach and full compensation to the owner, within the overall limitation of reasonableness.' [Citation.]" (*Heninger, supra,* 101 Cal.App.3d at pp. 864-865.) Thus the Court of Appeal in *Heninger* held that "If the trial court determined that appellants had personal reasons for restoring their land to its original condition, and that such a restoration could be achieved at a cost that was not unreasonable in relation to the damage inflicted and the value of the land prior to the trespass, the court should have exercised its discretion to award such restoration costs." (*Id.* at pp. 865-866.)

Although the Court of Appeal in *Heninger* found that it would not be reasonable to award the plaintiffs the $221,647 needed to entirely restore the land, "On retrial, the court's determination whether a reasonable restoration is possible should focus on the question whether an award of the cost of restoring the vegetative undergrowth (or some other method of covering the scar on the land and preventing further erosion) would achieve compensation within the overall limits of what the court determines to be just and reasonable." (*Heninger, supra,* 101 Cal.App.3d at p. 866.)

Here the "personal reason" exception adopted in *Heninger* supports the trial court's award. Contrary to the defendants' argument, the "personal reason" exception does not require that the Orndorffs own a "unique" home. Rather all that is required is some personal use by them and a bona fide desire to repair or restore. For instance in *Heninger* the court relied on the plaintiff's simple statement that " 'I think the land is beautiful, the natural forest beautiful, and I would like to see it that way.' " (*Heninger, supra,* 101 Cal.App.3d at p. 866.) According to the commentators to the Restatement, "if a building such as a homestead *is used for a purpose*

*personal to the owner,* the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building. So, when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has not been decreased by the defendant's invasion." (Rest.2d. Torts § 929, com. b, p. 546, italics added.) There is no dispute the Orndorffs enjoy the home they have occupied for 11 years and intend to repair it. To obtain reasonable repair costs they were not required to make any further showing.

In this regard we reject the defendants' argument the personal reason exception is incompatible with imposition of strict liability for defects in construction of mass-produced residential housing. The defendants suggest the mass-produced nature of the Orndorffs' home, which is sufficient to impose strict liability (see *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227-228 [74 Cal.Rptr. 749]), makes any personal reason for preferring one mass-produced home over another unreasonable.

■ Contrary to the defendants' suggestion, the doctrine of strict liability is not based upon the production of fungible goods. For instance in *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890 [159 Cal.Rptr. 119], the manufacturer of a kelp drying machine argued it was not subject to strict liability because the buyer had "special ordered" nine machines. In rejecting this argument we said: "[Defendant] appears to have been engaged in manufacturing and selling products as part of its full time commercial activity. The *uniqueness* of [the buyer's] order may not alter its responsibilities." (*Id.* at pp. 897-898, italics added.) Rather strict liability in tort is based upon the relative inability of consumers to protect themselves in dealing with manufacturers and the ability of manufacturers to spread the risk of loss over a large number of consumers. (See *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) Indeed in *Oliver* v. *Superior Court* (1989) 211 Cal.App.3d 86, 88-89 [259 Cal.Rptr. 160], we recently pointed out that strict liability has been imposed upon mass producers of homes because their buyers purchase advertised models and thus rely upon the builder's skill and expertise. Moreover, we pointed out the mass producer of homes, much like the mass producer of goods, "may protect himself from substantial loss by effectively spreading both the risk and actual costs of defective construction among a number of residences in a development." (*Id.* at p. 89.)

Neither a consumer's reliance upon a builder's expertise nor the builder's ability to spread his risks over a large number of his products suggests that a home, once purchased, can be readily replaced. Indeed the record in this

case suggests quite the contrary. ■ The Orndorffs purchased a house which abuts an open-space easement and thus is free of neighbors on one side; they have also made substantial improvements to their home in the 11 years they have occupied it. Accordingly, we find no inconsistency in the Orndorffs' reliance on the doctrine of strict liability and their desire to repair their home rather than abandon it.

We also find untenable the defendants' argument that by allowing recovery in excess of diminution in value we will somehow distort the loss distribution goals which the doctrine of strict liability in tort was designed to foster. The defendants' concern about excessive recoveries ignores the significant restrictions which the court in *Heninger* placed on application of the personal reason exception. Under *Heninger* repair costs are allowed only if they are reasonable in light of the value of the real property before the injury and the actual damage sustained. Thus, as we have seen, in *Heninger* the Court of Appeal found the $241,257 cost of complete restoration was not available as a measure of damages because it bore no reasonable relation to the value of the land before the trespass. We might add that the restoration cost was also unreasonable in light of the fact that the land had not suffered any loss in value.

By requiring that repair costs bear a reasonable relationship to value before harm and to the level of harm actually suffered, the *Heninger* case prevents the unusual or bizarre results the defendants in this case contend would occur should we stray in any manner from a diminution in value measure of damages. Contrary to the defendants' argument, application of the personal reason exception does not permit a plaintiff to insist on reconstruction of a unique product where the cost of repair will far exceed either the value of the product or the damage the defendant has caused. As we interpret *Heninger,* the owner of a unique home or automobile cannot insist on its reconstruction where the cost to do so far exceeds the value of the home or automobile. Nor are repair costs appropriate where only slight damage has occurred and the cost of repair is far in excess of the loss in value.

Here the damages awarded are well within the limitations imposed by *Heninger.* The record establishes that the Orndorffs' home was worth $238,500 in an undamaged condition. A total award—$243,539.95—which is 2.5 percent greater than the undamaged value of the realty, is in our view, well within reason.

However, it bears emphasis that even where the repair costs are reasonable in relation to the value of the property, those costs must also be reasonable in relation to the harm caused. Here the trial court's finding that

fill settlement was likely to continue and the Orndorffs' appraiser's opinion the home was worth only $67,500 in its present condition, suggest the damage sustained was indeed significant. Plainly this is not a case where the tortfeasors' conduct improved the value of the real property or only diminished it slightly. Rather we believe where, as here, the damage to a home has deprived it of most of its value, an award of substantial repair costs is appropriate.

In sum then we find the trial court had the power to award repair costs in this case.

## II

### Costs of Repairing Damage or Defect

Without citation to any case which has articulated the distinction, the defendants argue the trial court had no power to award the amount needed to cure the defect as opposed to the amount needed to repair the damage caused by the defect. In particular defendants contend the damage the Orndorffs' house has suffered could be remedied by installation of the less expensive reinforced mat.

While there may be cases where repairing damage rather than curing a defect would be appropriate, this is not one of them. As we have seen the trial court found that further settlement is likely. The Orndorffs presented evidence that in light of future settlement the only way of preventing future damage was installation of the more costly pier and grade system. In giving the Orndorffs the amount needed to install such a system it is plain the trial court accepted the Orndorffs' evidence. Thus the record demonstrates the amount needed to repair all the damage caused by the defect is the amount needed to install a pier and grade system.

Judgment affirmed; respondents to recover their costs on appeal.

Huffman, J., and Nares, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 2, 1990.