723 A.2d 623

OCEAN CLUB CONDOMINIUM ASSOCIATION, INC., A NONPROF-
IT CORPORATION OF THE STATE OF NEW JERSEY, PLAIN-
TIFF–RESPONDENT, v. ALBERT N. GARDNER, DEFENDANT–
APPELLANT, AND MLM ASSOCIATES AND JOSEPH M. MUR-
PHY, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted November 30, 1998—Decided December 16, 1998.

Before Judges HAVEY, PAUL G. LEVY and LESEMANN.

*Goldenberg, Mackler & Sayegh,* attorneys for appellant (*Fredric
L. Shenkman,* on the brief).

*Dilworth Paxson*, attorneys for respondent (*Marianne Brown* and *Francis Maneri*, on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

After taking control of the operations of the Ocean Club Condominium in Atlantic City, the condominium association sued the developer, alleging, among other things, that the developer had failed to pay its proportional share of common expenses during the approximately year-and-a-half period when it was acting as the association. Specifically, it argued that the developer had failed to pay its share of the so-called replacement reserve component of the common expense assessment, and moreover had failed to properly account for that portion of replacement reserves it had collected from the unit owners during the same period. The developer countered that it was not obligated to contribute to replacement reserves for unsold units, and it had properly applied amounts collected from the unit owners for replacement reserves to legitimate common expenses of the association.

After a bench trial and additional submissions from both parties regarding allocation and accounting issues, Judge Gibson determined that the developer was responsible for its share of replacement reserves based on unsold units, and awarded plaintiff damages. That part of his October 3, 1995 unpublished opinion reads as follows:

Plaintiff claims that Gardner & MLM violated their contractual obligation as well as a statutory duty by failing to have MLM pay its fair share of the replacement reserve portion of the Association's annual budgets. Gardner, on the other hand, claims that MLM was exempt from that obligation. He relies on the by-laws, state statutes and the N.J. Administrative Code. As to this issue, I am persuaded by plaintiff's position. To begin with, there is no question that the sponsor and the condominium association had an obligation under the Public Offering Statement to budget and collect common expenses, including "reserves for deferred maintenance, replacement and capital improvements of the common elements." A similar duty is imposed by the statute which requires the association to collect the cost of common expenses including the "maintenance, repair, replacement, cleaning and sanitation of the common elements". *N.J.S.A.* 46:8B–14(a). Under the terms of

the Public Offering Statement, the Association must place such reserves in separate accounts.

There is no serious dispute here with regard to the Association's obligation to budget and collect replacement reserves; instead, the question is whether the developer, while it was in control of the Association, was exempt from that obligation. In that regard, defendant relies on *N.J.S.A.* 46:8B–12.1(c) and Art. 6 § 10(C) of the by-laws. *N.J.S.A.* 46:8B–12.1(c) provides as follows:

If a developer holds one or more units for sale in the ordinary course of business, none of the following actions may be taken without approval in writing by the developer:

(1) Assessment of the developer as a unit owner for capital improvements.

However, since this court has already ruled that the developer was not required to share in any assessment intended to fund capital improvements, the real dispute relates to what is included in that term.

Nothing in the Public Offering Statement, the Condominium Act or the Administrative Code defines capital improvements. Based on the more persuasive testimony at trial, however, it would appear that within the context of the administration of condominiums, a capital improvement contemplates the creation of some new common facility or installation; that is, something beyond the items which were part of the original construction. An example would be the installation of a tennis court where none existed previously. In contrast, replacement and repair relates to common elements already in existence. This distinction is not only reinforced by the Public Offering Statement, even the expert for the defense conceded that such a distinction exists.

This distinction also makes sense from a policy point of view. It is one thing, for example, for a developer to be obligated to contribute to the repair and replacement of various common facilities while the sponsor is still in control. At that point, the developer has a clear stake in the success of the facility since its profits flow from the sale of new units. The benefit is less direct with regard to the creation of new facilities. Parenthetically, it should be noted that in the instant case, none of the budgets during the period of sponsor control provided for new construction whereas various provisions were made for the replacement and repair of existing common elements.

It is true, as defendant points out, that the Public Offering Statement specifically relieves the sponsor (and any institutional lender) of assessments for capital improvements of any kind, "including reserves." Indeed, when this issue was addressed during the cross motions for summary judgment, it was the court that raised the question of whether the reference to "reserves" was intended to embrace "replacement reserves". Having considered the matter further, however, including the factors amplified by the testimony, I have determined that the most logical conclusion is to distinguish between those reserves needed for replacement and repair and those relating to capital improvements. It is only the latter from which the sponsor is relieved.

Neither the condominium documents nor the statutory references indicate that the sponsor, as a unit owner, is relieved of the responsibility to pay replacement reserves. Certainly the Public Offering Statement makes no such distinction.

Even *N.J.S.A.* 46:8B–12.1(c), the statutory provision upon which defendant relies, merely excludes the developer for contributions to "capital improvements". In contrast, *N.J.S.A.* 46:8B–17, specifically obligates *all* unit owners to pay a proportionate share of the common expenses. Even where a unit owner waives the right to use a common element or abandons the unit there is no exemption from liability for common expenses. Finally, *N.J.S.A.* 46:8B–3(e) defines "common expenses" as including maintenance, repair and replacement of the common elements.

Defendant has also invoked the Administrative Code which requires that assessments for common expenses against units individually owned and "under development" be in proportion to the "benefit derived by the unit from the items included in the budget." *N.J.A.C.* 5:26–8.6. Although the Code provides no guidance as to what is intended by the language "benefit derived", it would seem likely that it was designed to accommodate situations in which units were still under construction. In such a setting, it would be logical and equitable to only assess such units to the extent that they benefit from the common elements which, during the development stage, would understandably be less than for those units that are complete.

Assuming that to be a fair interpretation of the language, it does not help the defendant here. There was no testimony in this case, for example, which indicated that during the critical time periods of 1985 and 1986, when the various units owned by MLM were being offered for sale, that those units were either not complete or were not substantially complete. Stated differently, as a fact finder, I did not find that units owned by MLM were "under development" during 1985 and 1986. It was the defendant's burden to satisfy the court in that regard and that burden was not met.

There is another issue which relates to plaintiff's replacement reserves claim and that is whether MLM violated the Public Offering Statement by failing to keep the collections that it did make in a separate account. Clearly that was a requirement of the P.O.S. and clearly MLM failed to comply. On the other hand, I have not found any harm to have resulted from that failure. Collections were made for replacement reserves and those collections were credited to the Association at the time of the turnover.

On the other hand, it does not appear that MLM accounted for this item for the period from January of 1985 through July of 1986. Based on a later accounting, the total collections should have been $138,378.00. However, it is still not clear whether that number reflects what the full occupancy obligation for replacement reserves should have been. Defendant's brief indicates that the sum should be $178,032.00 but I can't tell whether that includes the $76,090.00 that was presently due for the period from January 1 to July 31, 1986. Accordingly, although the court intends to rule in plaintiff's favor on this issue, the final number needs further discussion and hopefully can now be the product of a stipulation.

Before leaving this issue, some further comment is necessary with respect to defendant's argument that since the developer's subsidy guarantee was limited to deficits in operating expenses, any addition to that obligation for replacement reserves would be improper. I find that argument unpersuasive. As indicated above, there are a variety of statutory signals that suggest that the only exception to a developer's obligation to contribute to the payment of common expenses (as a

unit owner) relates to assessments for capital improvements and with respect to units under development. The fact that a developer is given the option to substitute a subsidy guarantee for what would otherwise be the burden of filing a bond for four times the annual budget, *N.J.A.C.* 5:26–8.6, does not also suggest that, having chosen such an option, the developer is relieved of the obligation to pay replacement reserves. Stated differently, I do not read the subsidy option as a limitation on the sponsor's preturnover obligation. Although there is no reported New Jersey case that addresses this issue, there is one decision from California where the court found that a developer's fiduciary duty includes the obligation to maintain adequate replacement reserves and to fund the same. *See, Ravens [Raven's] Cove Townhomes, Inc. v. Knuppe Development Co.,* [114 *Cal.App.*3d 783,] 171 *Cal.Rptr.* 334 (Cal.Ct.App.1981). I find that ruling persuasive.

Finally, defense counsel argues that even if MLM was responsible for contributing to replacement reserves, it should not be obligated to make up deficiencies created by the failure of other unit owners to pay their condominium dues, including the portion relating to replacement reserves. Although that seems to be a reasonable position, I recall nothing in the accounting to validate that as a fact. If that were the case, I would expect the sponsor's accounting to indicate that such accounts receivable existed. Assuming such deficits existed, the developer had the obligation to alert the association and thus to "account" on this issue; it failed to do so.

[citations to the record omitted.]

On appeal, the developer challenges the determination as to its liability for replacement reserves and the calculation of damages. We affirm substantially for the reasons expressed by Judge Gibson in his written opinion of October 3, 1995, the part of which concerning the replacement reserves we have repeated in order that it be published. We also rely on the findings and reasons expressed in his letter opinion of March 18, 1997, responding to a motion to settle the form of the judgment. However, we perceive that his letter opinion states that MLM is entitled to an "unchallenged" credit of $13,197 but, apparently through oversight, that sum was not credited in the Final Judgment.

Accordingly, the judgment of the Chancery Division is affirmed, substantially for the reasons contained in the opinions of Judge Gibson, except that the net Final Judgment entered against defendants is reduced by $13,197.