Filed 4/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CALIFORNIA MEDICAL ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>AETNA HEALTH OF CALIFORNIA INC.,<br><br>    Defendant and Respondent. | B304217<br><br>(Los Angeles County<br>Super. Ct. No. BC487412) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu M. Berle, Judge. Affirmed.

Whatley Kallas, Alan M. Mansfield, Edith M. Kallas and Deborah J. Winegard for Plaintiff and Appellant.

Spertus, Landes & Umhofer, Matthew Umhofer, Elizabeth Mitchell; Williams & Connolly, Enu Mainigi, Craig Singer, Grant Geyerman and Benjamin Hazelwood for Defendant and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and respondent Aetna Healthcare of California, Inc. (Aetna), doing business as Aetna U.S. Healthcare Inc. and Aetna Health of California, Inc., provides health insurance to its subscribers through a network of physicians who are contracted to provide services for discounted rates. Subscribers may receive services from these in-network physicians, or from out-of-network physicians at a higher share of the cost. Aetna implemented a policy to restrict or eliminate patient referrals by its in-network physicians to out-of-network physicians. Plaintiff and appellant California Medical Association (CMA) and others sued Aetna, seeking among other claims, an injunction for alleged violations of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200). The trial court granted Aetna's motion for summary judgment, finding CMA lacked standing under the UCL because it was not directly injured by Aetna's policy.

California courts have permitted associations like CMA to bring a nonclass representative action on behalf of their members and others under Code of Civil Procedure section 382 where such an action is justified by considerations of necessity, convenience, and justice. (See, e.g., *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 793–796, and cases cited therein.) None of the cases recognizing representational standing under section 382 involve UCL claims.

The law recognizing an association's standing to bring a nonclass representative action developed many years before the electorate passed Proposition 64 in 2004, which changed the requirements for standing to bring a UCL claim. Proposition 64 amended the UCL to limit standing to bring a private enforcement action only to one " 'who has suffered injury in fact and has lost money or property as a result of the unfair competition.' " (*Amalgamated Transit Union, Local 1756, AFL-*

*CIO v. Superior Court* (2009) 46 Cal.4th 993, 1000 (*Amalgamated Transit*); see also Bus. & Prof. Code, § 17204.)

This appeal presents two issues. First, we must decide if the body of law permitting an association to bring a nonclass representative action bestows standing upon CMA to seek an injunction against Aetna under the UCL, whether or not CMA individually suffered injury in fact and lost money or property. We find the answer to that question is "no." Next, we must decide whether CMA's evidence that it diverted substantial resources to assist its physician members who were injured by Aetna's policy created a material disputed fact as to whether CMA itself suffered injury in fact and lost money or property. We find the answer to that question also is "no" and affirm the trial court's grant of summary judgment on that basis.

## BACKGROUND

An in-network physician commenced this action as a class action against Aetna in 2012. The complaint was amended in 2013 to add more plaintiffs, including individual physicians, their medical practices, and medical associations, including CMA. The putative class action alleged breach of contract, tort claims, violation of the UCL, and other claims. No motion for class certification was ever filed. After several years of litigation and mediation, the parties stipulated to dismiss the class claims and to dismiss all plaintiffs except CMA, which would proceed as the only plaintiff with a single cause of action against Aetna for injunctive relief under the UCL.

The operative fifth amended complaint alleged Aetna's insurance plans were marketed to physicians and subscribers as permitting subscribers to use out-of-network providers and facilities without limitation, albeit at a higher share of the cost.

3

But the agreements between Aetna and its member physicians required the physicians to use in-network providers to the "fullest extent possible, consistent with sound medical judgment." Aetna sent letters to member physicians threatening that "[u]se of [out-of-network] facilities may be considered non-compliance with your physician agreement in which you agree to use contracted, participating network facilities." Aetna also told its member physicians that continued referrals to out-of-network providers would result in publication of a warning to subscribers about out-of-network costs on the physician's "DocFind" profile on Aetna's website.

CMA alleged Aetna unlawfully interfered with its member physicians' exercise of their independent medical judgment and treatment of patients in violation of various California statutes, including Business and Professions Code sections 510 and 2056, Insurance Code section 10133, and Health and Safety Code section 1367, and other statutes.

Regarding standing, the complaint alleged CMA "is a non-profit, incorporated professional organization that represents over 37,000 physicians throughout the state of California," and CMA "supports its members and carries out its mission through legislative, legal, regulatory, economic, and social advocacy." CMA alleged it was "forced to expend significant time and resources including but not limited to investigation and review of [Aetna's] wrongdoing, discussion and strategizing within their Executive Committee and Board of Director Meetings, and devoting time responding to physician inquiries about [Aetna's] wrongdoing."

Aetna, relying on *Amalgamated Transit*, moved for summary judgment, or in the alternative, summary adjudication,

4

contending there was no material dispute that CMA lacked standing to bring a UCL claim because it was not directly harmed by Aetna's alleged wrongdoing. Aetna provided evidence that its challenged policy did not apply to CMA, which had no contract with Aetna, and CMA primarily claimed injury to its physician members for loss of patients and revenue. Aetna argued CMA's claim that it diverted resources to address Aetna's policy was insufficient to establish that CMA sustained direct injury and loss of money.

In opposition, CMA provided the declaration of Francisco Silva, its general counsel and senior vice president of legal, policy, and economic services, who testified that "preventing conduct that interferes with the physician-patient relationship" is part of CMA's core mission. He testified CMA has been "especially active in advocacy and education on issues involving heath insurance companies' interference with the sound medical judgment of physicians providing care to their enrollees."

Mr. Silva explained in 2010, CMA heard about Aetna terminating or threatening to terminate its physician members from its network for referring patients to out-of-network providers. CMA "diverted . . . staff time from other CMA projects and duties that would otherwise have been devoted to serving our membership to investigate Aetna's business practice . . . ." CMA's investigation determined that Aetna's conduct interfered with its members' exercise of their sound medical judgment, and therefore Aetna's conduct was frustrating CMA's purpose of protecting physicians and the public. The investigation was not undertaken for the purpose of bringing a lawsuit, but to advise CMA's members and the public about how to deal with Aetna's threats.

5

Mr. Silva estimated that CMA diverted 200 to 250 hours of staff time addressing Aetna's conduct.

The trial court granted the motion and entered judgment for Aetna, finding *Amalgamated Transit* controlled on the issue of standing to bring UCL claims and CMA had not shown direct injury or loss of money or property. This timely appeal followed.

## DISCUSSION

### 1. Standard of Review

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to [that] cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) The party opposing summary judgment "shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (§ 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar*, *supra*, 25 Cal.4th at p. 854.) It is no longer called a "disfavored" remedy. (*Perry,* at p. 542.) "Summary

6

judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*) On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

**2.     An Association Must Sustain Direct Economic Injury to Itself and Not Just Its Members to Bring a UCL Claim.**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) In 2004, the California electorate amended the UCL to provide that private enforcement actions may be brought only by one who has suffered direct economic injury. (*Amalgamated Transit*, *supra*, 46 Cal.4th at p. 1000; see also Bus. & Prof. Code, § 17204 ["Actions for relief pursuant to this chapter shall be prosecuted exclusively . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."].) This standing requirement replaced the former standing provision which allowed a UCL claim to be brought " 'by any person acting for the interests of itself, its members or the general public.' " (*Amalgamated Transit*, at p. 1000.)

In *Amalgamated Transit*, a union plaintiff sought to assert UCL claims against defendant employers. The union conceded it had not suffered direct injury under the UCL and claimed standing as the assignor of the claims of employees and former employees. The Supreme Court held that "[t]o allow a noninjured assignee of an unfair competition claim to stand in the shoes of

7

the *original, injured claimant* would confer standing on the assignee in direct violation of the express statutory requirement in the unfair competition law, as amended by the voters' enactment of Proposition 64, that a private action under that law be brought *exclusively* by a 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.' " (*Amalgamated Transit*, *supra*, 46 Cal.4th at p. 1002.) The court concluded that "all unfair competition law actions seeking relief on behalf of others . . . must be brought as class actions." (*Id*. at p. 1005.)

Two years after deciding *Amalgamated Transit*, the Supreme Court again held that, to have standing to bring a claim under the UCL after the 2004 amendments, a plaintiff must be able to show he personally sustained economic harm and that he lost money or property caused by the defendant's misconduct. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 317 (*Kwikset*) ["Proposition 64 should be read in light of its apparent purposes, i.e., to eliminate standing for those who have not engaged in any business dealings with would-be defendants . . . , while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices. . . ."].) The plaintiff in *Kwikset* was a consumer who bought a Kwikset lockset that was misrepresented as "Made in U.S.A." He would not have bought the lockset but for the misrepresentation. (*Id*. at p. 319.) The Supreme Court found "plaintiffs who can truthfully allege they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise, have 'lost money or property' within the meaning of Proposition 64 and have standing to sue." (*Id*. at p. 317.)

8

We find the decisions in *Amalgamated Transit* and *Kwikset* require an association such as CMA to produce evidence that CMA itself, and not just its members, lost money or property in order to have standing to sue under the UCL; and the cases recognizing an association may have standing to assert its members' *non*-UCL claims do not apply here. (See, e.g., *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, *supra*, 114 Cal.App.3d at pp. 793–796; *Kwikset*, *supra,* 51 Cal.4th at pp. 317–319.)

3.  **Evidence That an Association Diverted Resources to Investigate Its Members' Claims of Injury and Advocate for Their Interests Is Not Enough to Show Standing Under the UCL.**

This brings us to the question whether CMA produced evidence of direct economic injury to CMA itself. CMA argues we should rely upon *Animal Legal Defense Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270 (*ALDF*) to find diversion of its resources is a sufficient injury to confer standing under the UCL. In its analysis, the *ALDF* court discussed *Kwikset* at length, concluding the plaintiff had standing because, like the plaintiff in *Kwikset*, the plaintiff in *ALDF* spent resources it would not have spent but for defendants' illegal conduct. (*ALDF*, at pp. 1283–1284.)

Plaintiff in *ALDF* was an organization that advocated for a ban on the sale of foie gras and engaged in a campaign to inform legislators and the public that producing foie gras involves animal cruelty because birds are forcibly overfed. The plaintiff sued to enjoin defendants under the UCL for selling foie gras in their restaurant in violation of the ban on its sale. (*ALDF*, *supra*, 234 Cal.App.4th at p. 1275.) Defendants filed a special motion to

9

strike under Code of Civil Procedure section 425.16, arguing the lawsuit arose from protected activity, and that the plaintiff could not demonstrate a probability of prevailing on the merits because it lacked standing under the UCL. (*ALDF*, at p. 1278.)

To show it had standing, the plaintiff produced evidence that it diverted significant organizational resources to combat the defendants' continuing illegal sales of foie gras. The plaintiff had lobbied in support of the ban and after it became law. The plaintiff paid a private investigator to dine at the restaurant where he was served foie gras three times after the ban became law. The plaintiff spent significant staff time and resources over the course of three months to share its investigation findings with local law enforcement authorities and try to persuade them to enforce the ban. The plaintiff itself was harmed by having to spend money that would have been unnecessary to spend if the defendants had not violated the ban. (*ALDF, supra,* 234 Cal.App.4th at pp. 1279–1282; *id.* at p. 1282 ["Plaintiff, thus, has presented evidence of a genuine and long-standing interest in the effective enforcement of the [statutory ban on foie gras] and in exposing those who violate it. Plaintiff's evidence provides a basis to conclude that defendants' alleged violations of the statute tended to frustrate plaintiff's advocacy for an *effective* ban on the sale of foie gras in California, and tended to impede plaintiff's ability to shift its focus on advocacy efforts in, for example, other states and at the federal level."].)

CMA says the declaration of Mr. Silva and other evidence it produced show the same type of injury that *ALDF* held was sufficient to show a likelihood of success in proving the plaintiff had standing under the UCL, and Aetna did not object to any of CMA's evidence.

We find *ALDF* is distinguishable and does not apply here. The key factual and procedural distinction is the plaintiff in *ALDF* did not bring a representative action, as CMA did in this case. ALDF was not advocating on behalf of or providing services to help its members deal with their loss of money or property. The *ALDF* opinion does not even say whether ALDF had members or who they might be. (*ALDF*, *supra*, 234 Cal.App.4th at pp. 1279–1280.) We can guess if ALDF has members, they support ALDF's mission to prevent animal cruelty. The mission and very purpose for being of the plaintiff in *ALDF—to* prevent animal cruelty—were directly injured by the defendants' violation of the ban on sales of foie gras. (*Id.* at pp. 1282–1283.)

Unlike the facts in *ALDF*, the evidence here was that CMA was founded to advocate on behalf of its physician members. The staff time spent here in response to Aetna's termination and threats to terminate physicians was typical of the support CMA provides its members in furtherance of CMA's mission. If we were to apply *ALDF* to this case, then any organization acting consistently with its mission to help its members through legislative, legal and regulatory advocacy could claim standing based on its efforts to address its members' injuries. The 2004 amendments to the UCL eliminated such representational standing. (*Amalgamated Transit*, *supra*, 46 Cal.4th at p. 1005.)

We now turn to the key legal distinction between *ALDF* and this case. The court in *ALDF* did not distinguish *Amalgamated Transit* or explain how its decision was either consistent with, or created an exception to, or extended the rationale and holding of *Amalgamated Transit*, which, like this case, was a representative action seeking to rectify injury to its aggrieved members. The likely reason for this is because ALDF did not bring a representative action on behalf of aggrieved

11

members like the union in *Amalgamated Transit*, or CMA in this case.  Unlike the union in *Amalgamated Transit*, CMA does not acknowledge that only its members, and not CMA itself, suffered actual injury, but we have rejected CMA's position.  Just like the union in *Amalgamated Transit*, CMA brought this representative action to rectify injury to its aggrieved physician members.  Like the trial court below, we see no way to square the opinion in *ALDF* with the on-point Supreme Court decision in *Amalgamated Transit*.

CMA also relies on *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, which held a private person or association may seek injunctive relief for the benefit of the general public, so long as the plaintiff has standing.  (*Id.* at p. 259 ["We conclude that these provisions do not preclude a private individual who has 'suffered injury in fact and has lost money or property as a result of' a violation of the UCL or the false advertising law (Bus. & Prof. Code, §§ 17204, 17535)—and who therefore has standing to file a private action—from requesting public injunctive relief in connection with that action."].)  Assuming without deciding CMA seeks to benefit the general public, and not just its members, *McGill* is of no use to CMA because it did not suffer injury in fact or lose money or property as a result of the UCL violations it alleges here.

As explained at the outset, it is unnecessary to address and discuss the other California cases CMA cites (e.g., *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, *supra*, 114 Cal.App.3d at pp. 793–796, and cases cited therein), holding an association may maintain a representative, nonclass action on behalf of its members, because none of those cases involved claims under the UCL or another statute that expressly limited the right to sue to those persons who suffered direct injury in fact and lost money or property.

12

4. **The Federal Authorities CMA Cites Are Neither Binding on This Court Nor Instructive.**

We recognize that in amending the UCL in 2004, the drafters and electorate intended to incorporate federal requirements for standing. "[Proposition 64] declares: 'It is the intent of the California voters in enacting this act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been *injured in fact under the standing requirements of the United States Constitution.*' " (*Kwikset, supra*, 51 Cal.4th at p. 322.) However, *Kwikset* also acknowledged that UCL standing requirements are far more stringent than the federal standing requirements. " 'Whereas a federal plaintiff's "injury in fact" may be intangible and need not involve lost money or property, Proposition 64, in effect, added a requirement that a UCL plaintiff's "injury in fact" specifically involve "lost money or property." ' " (*Kwikset*, at p. 324.) We do not find the federal authorities CMA cites are instructive in deciding the issue of an association's standing to bring a representative action under the UCL.

Most of the federal authorities cited in CMA's briefs discuss organizational or associational standing to bring *non*-UCL claims. (See, e.g., *Fair Housing Council v. Roommate.com, LLC* (9th Cir. 2012) 666 F.3d 1216, 1219 [addressing an organization's standing to seek relief under California Fair Employment and Housing Act]; *Fair Housing of Marin v. Combs* (9th Cir. 2002) 285 F.3d 899, 902–905 [analyzing standing in the context of fair housing claims]; *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review* (9th Cir. 1991) 959 F.2d 742, 748 [addressing standing to assert claims for violations of immigration law].) None of these cases is helpful as they do not

13

consider the stringent requirements for UCL standing after the Proposition 64 amendments became effective in 2004.

*Southern California Housing Rights Center v. Los Feliz Towers Homeowners Assn.* (C.D.Cal. 2005) 426 F.Supp.2d 1061, does address UCL standing.  That case held the Housing Rights Center had UCL standing after the 2004 amendments because the center presented "evidence of actual injury based on loss of financial resources in investigating this claim and diversion of staff time from other cases to investigate the allegations here." (*Southern California Housing Rights Center*, at p. 1069.)  That case predates *Amalgamated Transit* and *Kwikset* by four and six years, respectively.  The case offers little guidance since there is now current, binding California law that governs UCL standing to bring a representative action.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1126 [federal law is not binding on this court in its interpretation of state law].)

Because we have found that CMA did not demonstrate a material factual dispute as to standing, we affirm the judgment and do not address the parties' remaining arguments on appeal, as to whether the judgment may be affirmed on other grounds.

### DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.

14